Argued July 23, affirmed July 30, 1915.

## PEARCE *v.* ROSEBURG.*

(150 Pac. 855.)

**Municipal Corporations—Charter Amendments—Initiative—Election.**

1. Article IV, Section 1a, of the Constitution, authorizing cities to provide for the manner of exercising the initiative and referendum powers as to municipal legislation, authorizes a city by ordinance to prescribe the manner in which an election to amend the charter by initiative shall be held.

**Municipal Corporations—Amendments of Charters—Elections—Compliance With Ordinance.**

2. An ordinance of a city, prescribing the manner for the holding of elections on initiative measures, requires the recorder to give notice of the election, stating therein the measure to be voted on, and requires the council to appoint judges and clerks of election, and to designate voting places, and that on failure so to do, the clerk shall designate the polling places, and the electors present at the time for

*For authorities on the subject of initiative and referendum, see notes in 11 L. R. A. (N. S.) 1092; 33 L. R. A. (N. S.) 969; 50 L. R. A. (N. S.) 196.    REPORTER.

opening the polls shall elect the judges and clerks. The council, in ordering an election on an initiative charter amendment, did not appoint judges and clerks, nor designate the polling places, but the clerk in the notice of election designated the polling places, and stated that the qualified electors, at the time for opening the polls, would elect judges and clerks. The notice of election was in conformity with the ordinance, and was published as required thereby. *Held*, that the ordinance was complied with and the election valid.

[As to when change in municipal charter is to be regarded as creating new charter instead of amendment, see note in **Ann. Cas. 1914D, 1171.**]

**Municipal Corporations—Initiative Measures—Elections—Validity.**

3. Where there was nothing to show that, at a special initiative election in a city to adopt a charter amendment authorizing the creation of indebtedness, any voter not a taxpayer was denied the right to vote, and the evidence showed that 643 votes were cast for the amendment while 78 were cast against it, out of an electorate of over 2,000, the court in determining the validity of the election, would not consider whether Special Laws of 1905, page 36, Section 14, limiting the right to vote to owners of property within the city limits, was in conflict with Article II, Section 2, of the Constitution.

**Municipal Corporations—Initiative and Referendum—Statutes—Validity.**

4. So much of Laws of 1915, page 187, as attempts to restrict the powers of cities and towns to levy taxes is violative of Article XI, Section 2, of the Constitution giving to cities and towns the power to enact and amend their charters, subject only to the Constitution and criminal laws of the state, for the Constitution prevents legislative interference with purely local and municipal matters, such as city taxation, and extends to the voters of municipalities full power to regulate these subjects.

**Municipal Corporations—Public Improvements—Construction of Railroads—Description of Terminus of Railroad.**

5. An amendment to the charter of a city, which grants to the council thereof power to contract for the construction of a railroad from the city to a point on the "North Umpqua River at its intersection with the western boundary of the Cascade Range forest reserve," and to issue bonds therefor, sufficiently designates the terminus of the road, though the Cascade Range forest reserve has been, by act of Congress, divided, and that part intersected by the river mentioned is now known as the Umpqua National forest.

**Municipal Corporations—Powers and Functions—Contracts—Judicial Supervision.**

6. The court, in a suit by a taxpayer of a city to enjoin it from entering into a contract for the construction of a railroad as authorized by the city charter, will not consider whether the contract is a good business proposition.

**Appeal and Error—Moot Cases.**

7. The power of the court on appeal to dismiss a case as fictitious should not be exercised except where the fictitious character appears

either from the pleadings or from satisfactory evidence, especially where persons, claiming that the suit is fictitious, fail to appear and make the objection and avail themselves of the point in the trial court.

**Action—Moot Cases.**

8.   A suit by a taxpayer to enjoin a city from contracting for the construction and operation of a railroad, as authorized by the charter, and from issuing bonds for the construction thereof, will not be dismissed as fictitious merely because the suit is a friendly one, pursued without rancor, and with the understanding that unnecessary delays will not be permitted.

From Douglas: GEORGE F. SKIPWORTH, Judge.

In Banc.   Statement by MR. JUSTICE McBRIDE.

This is a suit brought by Harry Pearce against the City of Roseburg to enjoin it from entering into a contract with the Roseburg & Eastern Railroad Company for the construction and operation of a railroad running out of said city, and from issuing bonds for the purpose of constructing the same, and generally to prevent the city from in any way participating in the construction or ownership of the proposed road. The facts disclosed by the complaint are as follows: The common council, thinking it desirable that a railway should be built, passed an ordinance submitting an amendment to the city charter to a vote of the people, which ordinance and proposed amendment are as follows:

"An ordinance proposing the enactment of an amendment to the existing municipal charter of the City of Roseburg to authorize the City of Roseburg to construct a railroad from said city to a point on the North Umpqua River where it intersects the western boundary of the Cascade Range forest reserve, and providing for the issuance of bonds in a sum not to exceed three hundred thousand dollars, to provide the means for constructing said railroad, and for leasing and selling said railroad, providing a tax for paying on said bonds and a sinking fund for paying said

bonds at maturity, and submitting the said proposed amendment to the qualified voters of the City of Roseburg at a special election of the City of Roseburg to be held on Thursday, the third day of June, 1915, and declaring an emergency.

"The city of Roseburg does ordain as follows, and be it ordained by the people of the City of Roseburg:

"Section 1. The common council of the City of Roseburg, deeming it expedient, hereby proposes the enactment of the following amendment to the existing charter of said City of Roseburg, to wit: Proposed charter amendment. An act to amend the municipal charter of the City of Roseburg, Oregon, as enacted by the legislative assembly of the State of Oregon, by 'an act to incorporate the City of Roseburg, and to repeal all acts and parts of acts in conflict therewith to wit: An act entitled "An act entitled an act to incorporate the City of Roseburg, approved October 3, 1872; and an act entitled an act to amend an act entitled an act to incorporate the City of Roseburg, approved October 19, 1880; and an act to amend an act entitled an act to incorporate the City of Roseburg, approved February 23, 1880; also an act amendatory of said act, filed in the office of the Secretary of State, February 19, 1891; and also an act to incorporate the City of Roseburg, and to define the powers thereof, approved February 25, 1895, and to repeal all acts amendatory thereof and in conflict therewith"' (which act was filed in the office of the Secretary of State on February 22, 1905), and as amended by vote of the people of said city at an election held May 6, 1907, and as amended by vote of the people of said city at the general election held therein on the 5th day of October, 1914. Be it enacted by the people of the City of Roseburg, Oregon: The municipal charter of the City of Roseburg, Oregon, as enacted by the legislative assembly of the State of Oregon, by 'An act to incorporate the City of Roseburg, and to repeal all acts and parts of acts in conflict therewith, to wit: An act entitled "An act entitled an act to incorporate the City of Roseburg, approved October 3, 1872; and an

act entitled an act to amend an act entitled an act to incorporate the City of Roseburg, approved October 19, 1880; and an act to amend an act entitled an act to incorporate the City of Roseburg, approved February 23, 1889; also an act amendatory of said act filed in the office of the Secretary of State February 19, 1891; and also an act to incorporate the City of Roseburg, and to define the powers thereof, approved February 25, 1895, and to repeal all acts amendatory thereof and in conflict herewith," ' (which act was filed in the office of the Secretary of State on February 22, 1905), and as amended by the vote of the people of said city at an election held May 6, 1907, and as amended by the vote of the people of said city at the general election held therein on the 5th day of October, 1914, shall be and the same hereby is amended by adding thereto sections numbered 156 to 161, inclusive, reading as follows, to wit:

"Section 156. The common council is hereby granted the power, in addition to all the other powers granted by the municipal charter of the City of Roseburg, to construct a standard gauge railroad from the City of Roseburg to a point on the North Umpqua River at its intersection with the western boundary of the Cascade Range forest reserve. Said railroad shall be a common carrier for both freight and passenger service.

"Section 157. For the purpose of raising the necessary funds to construct said railroad the common council is hereby authorized to issue and sell the bonds of the city, bearing five per cent interest per annum, in a sum not to exceed three hundred thousand dollars. Said bonds shall mature and become payable thirty years from the date of their issue and may be paid at any time the interest is payable after ten years from the date said bonds are issued, at the option of the City of Roseburg.

"Section 158. The common council of the city of Roseburg is hereby directed to enter into a contract for the construction of said railroad and may lease the same on such terms and for such periods of time

as to said council may seem for the best interests of the City of Roseburg, provided that such lease shall prescribe that all persons, firms, associations and corporations desiring to transport material of any kind over said railroad shall be granted the same service and the same rates, and that no discrimination as to either rates or service shall be made. The common council is authorized to sell said railroad provided that said sale shall not be made for a less sum than three hundred thousand dollars. The powers herein granted to the common council may be exercised by the people of the City of Roseburg through the initiative.

"Section 159. The common council of the City of Roseburg is hereby directed to levy a tax annually in addition to the tax authorized by Section 33 of said charter, and in addition to all other taxes authorized to be levied by said charter or any of the amendments thereto, sufficient to pay the interest accruing on the bonds authorized by Section 156, and after ten years from the date of the issuance of said bonds, such further levy as may be necessary to provide a sinking fund sufficient in amount to pay said bonds at maturity; and said council may cause said sinking fund to be loaned at interest upon approved security or invested in approved interest bearing securities in the name of the city, pending maturity of said bonds.

"Section 160. The indebtedness authorized by this amendment to the municipal charter of the City of Roseburg is in addition to all indebtedness heretofore authorized and incurred by said City of Roseburg and is not to be considered as affected by any limits of indebtedness in said charter or elsewhere.

"Section 161. All parts of the charter of the City of Roseburg and all ordinances and parts of ordinances of said city in conflict with the provisions of this charter amendment are hereby modified or repealed as the case may require in order that this amendment may be in effect.

"Sec. 2. A special election of the qualified voters of the City of Roseburg is hereby called to be held

on the 3d day of June, 1915, for the purpose of voting on said proposed amendment to the municipal charter of the said City of Roseburg as set out in Section 1 of this ordinance.

"Sec. 3. The title of the proposed amendment to be voted on at said special election shall be as follows, to wit: 'Amendment of Roseburg charter authorizing borrowing three hundred thousand dollars for building railroad to Cascade Range forest reserve.'

"Sec. 4. Inasmuch as it is necessary in order to develop the industries of the city that this ordinance go into immediate effect, and that the development of certain industries depend upon the passage of this ordinance, and that said industries are necessary for the immediate preservation of the peace, health, and safety of the city, an emergency is hereby declared to exist, and this ordinance shall be in effect immediately after its passage and approval by the mayor.

"Passed by the common council April 12, 1915. Approved by the mayor April 12, 1915.

"N. RICE, Mayor.

"Attest: CARL E. WIMBERLY, City Recorder."

Thirty days prior thereto the recorder of the city caused 50 notices to be printed, announcing that said ordinance had passed, each including a copy of the proposed amendment, and thereafter, on the 14th day of May, 1915, caused a copy of said printed notice to be posted in a conspicuous place in each of the four wards of the city, which places are designated and described in the complaint. They are all public and conspicuous places, and the notices remained posted for a period of 10 days immediately preceding said special election. Similar notices were caused to be printed in the "Umpqua Valley News" and "Roseburg Review," both papers being published and having general circulation in the City of Roseburg. Said notices

contained a brief statement of the measure to be voted upon. At said election the judges and clerks were instructed to permit resident taxpayers only to vote, and no votes were cast by any person other than resident taxpayers. The ordinances of the city respecting the conduct of elections and the declaration of the result and the general method of conducting elections are set up substantially in full, but their length prevents them from being reproduced in this statement. The amendment to the charter was adopted by the voters at the election. It does not limit the amount of money to be raised by taxation yearly for the purpose of providing a sinking fund for the payment of the bonds mentioned in said amendment to said charter. The national forest intersected by the North Umpqua River is not now designated by the name of the Cascade Range forest reserve, but is officially known as the Umpqua national forest, which was formerly a part of the Cascade Range forest reserve. The Cascade Range forest reserve as it was formerly designated was divided, and the name of that portion thereof intersected by the North Umpqua River was changed by the act of Congress to Umpqua national forest. At the regular stated meeting of the common council of the City of Roseburg, held at the city hall on Monday the 7th day of June, 1915, a resolution was adopted by appointing a committee directed and empowered to enter into a contract with the Roseburg & Eastern Railroad Company for the purpose of constructing for said city a railroad of standard gauge and construction from the said city in a general easterly direction to the intersection of the North Umpqua River with the western boundary of the Umpqua national forest. The said common council intends to and will, unless restrained by an order of this court,

issue the bonds of said city as provided in said amend-
ment to the city charter hereinabove set out, for the
sum of $300,000 and sell the same and use the money re-
ceived therefor in paying for the construction of said
railroad. The quantity of standing timber which will
be opened up to market by the proposed road is
21,000,000,000 feet, and by the construction of the pro-
posed road the wealth of their forests will become
tributary to Roseburg. The defendant city intends
to enter into a contract with said Roseburg & Eastern
Railroad Company, and will enter into such contract
unless restrained by the order of this court, wherein
and whereby the said city will pay to the said Rose-
burg & Eastern Railroad Company for the construc-
tion of said railroad the sum of $300,000, and, as an
inducement to said company to construct said road
for said sum of money and to equip, maintain and
operate said road after the same shall have been con-
structed, will lease the same to said railroad company
for a long term of years, reserving as a rental for
such lease a certain and fixed part of the net earn-
ings of said railroad company and the right to sell
said railroad during the said term of said lease, and
upon the sale of said railroad to terminate said lease.
The said railroad company will undertake, in and by
said contract with the defendant city, to construct said
railroad from the City of Roseburg to the Umpqua
national forest, and in consideration of the lease of
said railroad from said defendant city, for a long term
of years, will equip, maintain and operate said rail-
road as a common carrier for passengers and freight,
maintaining a regular schedule of passenger and
freight trains thereon, and will pay all taxes and other
expenses in the maintenance and operation of said
railroad, and will engage to save harmless the said

city from all such expenses and all damages resulting from the maintenance, construction and operation thereof. It is proposed by the contracting parties, to wit, the said defendant city and said railroad company, that the defendant city may retain a voice in fixing the rates for the transportation of freight over said railroad, and said company will engage that all persons desiring to employ said company for the transportation of freight, and particularly of sawlogs, will be afforded equal services and the same rates. The defendant city also proposes, in and by said contract, to grant and give to the said railroad company an option to purchase said railroad during the term of said lease for the sum of $300,000.

There was a demurrer to the complaint, which being sustained, the plaintiff appeals.          AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Oliver P. Coshow.*

For respondent there was a brief over the names of *Mr. Albert Abraham* and *Mr. Carl E. Wimberly,* with an oral argument by *Mr. Abraham.*

There was a brief and an oral argument by *Mr. Ralph R. Duniway, amicus curiae.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1, 2. Upon the case made by the pleadings the election at which the charter amendment was adopted appears to have been conducted substantially in conformity with the law. There is not in the charter of Roseburg as it appears in the Special Laws of 1905, page 33, any provision for holding special elections upon initiative

measures, but Section 1a, Article IV, of our Constitution provides:

"The manner of exercising said powers shall be prescribed by general laws, except that cities and towns may provide for the manner of exercising the initiative and referendum powers as to their municipal legislation."

This constitutional provision we consider ample to authorize the city by ordinance to prescribe the manner in which the election shall be held, and this it has done by Section 8 of Ordinance 208, which requires the recorder, at least 30 days prior to the time when the election is to be held, to cause to be printed 50 notices announcing the filing of the petition with a statement of its tenor and effect, etc., and to cause one or more of such notices to be posted in each ward of the city for a period of 10 days before the election and a notice stating the time and place of the election, with a brief statement of the measure to be voted on, to be published in some newspaper of general circulation in the city for two weeks preceding the election. All this was done, and more, as it appears that the notices were printed in two city papers of general circulation instead of one, and it is safe to assume that every voter in the city knew just when and where and for what purpose the election would be held. Section 10 of said ordinance requires the council to appoint judges and clerks of election and to designate the polling places, but further provides that in case of a failure on its part to perform these duties, the clerk shall designate the polling places, and that the electors present at the time for opening the polls shall elect the judges and clerks. The council did not comply with either of these requirements, and, as before noted,

the clerk in the notice of election designated the polling places and inserted in the notice the following:

"The council having failed to appoint judges and clerks for said election within the time provided by law, or at all, the qualified electors present at the polling places in each ward at the time for the opening the polls will elect, by *vive voce* vote, judges and clerks for said election."

Thus it appears that every provision of the ordinance requisite to constitute a valid election was complied with.

Section 14 of the charter of Roseburg (Sp. Laws 1905, p. 36) provides, among other qualifications of a voter:

"He shall be the owner of real or personal property in his own right and name, situated within the corporate limits of the City of Roseburg, and shall have paid a tax thereon, or shall be subject to pay a tax thereon, as shown by the last assessment-roll of the county of Douglas."

And it is stated in the complaint that the judges of election were instructed to permit none but taxpayers to vote. A similar provision in the charter of the City of Salem was held void in *Livesley* v. *Litchfield,* 47 Or. 248 (83 Pac. 142, 114 Am. St. Rep. 920), which was a case arising out of the refusal of the election officers to accept the vote of a nontaxpayer at an election held for the purpose of choosing city officers. Whether the same rule would obtain in an election held purely for the purpose of determining whether the city would adopt or reject a measure involving solely a question of taxation has not been determined by any decision involving that exact question, although in *Oregon-Wisconsin Timber Co.* v. *Coos County,* 71 Or. 462 (142 Pac. 575), it was held that Section 6391, L. O. L.,

prescribing the qualifications of voters at district road meetings, and which limited the right to vote at such meetings to taxpayers, was not violative of Section 2, Article II, of the Constitution. But it is unnecessary to decide this question here, as there is nothing to indicate that any vote was refused by reason of the person offering to vote being a nontaxpayer, and it is a matter of common notoriety that the nontaxpaying vote usually preponderates in favor of any measure involving public expenditures. It is easy to be generous with other people's money, but the man who has to foot the bill by an increase in his taxes is generally cautious about enlarging them. Neither is there anything unusual in the fact that out of an electorate of over 2,000 only 721 votes were cast at the election. At general elections in this state, where party spirit runs high, not more than 80 per cent of the actual number of electors attend the polls, while at special elections of this character the number is small compared with the actual registered vote. Thus in *State ex rel. v. Portland,* 65 Or. 273 (133 Pac. 62), it appeared that on the question of the adoption of the commission form of government, a matter of extraordinary moment to the citizens of Portland, only 46 per cent of the total vote was polled, and in *Kiernan v. Portland,* 57 Or. 454 (111 Pac. 379, 112 Pac. 402, 37 L. R. A. (N. S.) 339), upon a measure involving an expenditure of $2,000,000, about 25 per cent only of the total vote was cast, while in the case of *Thielke v. Albee,* 76 Or. 449 (150 Pac. 854), recently decided here, wherein the regulation of "jitneys" had been thoroughly discussed by the press and public, only about 30 per cent of the vote was cast. In the case at bar there were 721 votes cast, 643 being in favor of the amendment and 78 against it. It is only reasonable

to conclude that if every voter had gone to the polls, the vote would have maintained about the same proportion.

4. In our opinion so much of Chapter 159, Laws of 1915, as attempts to restrict the power of cities and towns to levy taxes is antagonistic to Section 2, Article XI, of our present Constitution, which gives to cities and towns the power to enact and amend their charters, subject only to the Constitution and criminal laws of the state. The evident purpose of this amendment was to prevent legislative interference with purely local and municipal matters, and to extend to the voters of such municipalities full power to regulate these subjects as they might see fit. City taxation is entirely a local matter with which the people of the state at large have no concern. The writer, while still adhering to the dissenting opinions expressed in *Kalich* v. *Knapp,* 73 Or. 558 (145 Pac. 22); and *Branch* v. *Albee,* 71 Or. 188 (142 Pac. 598), considers it is settled in this state that as to matters purely municipal the state legislature cannot intermeddle by either general or special legislation, although as to matters affecting the people generally the power of the legislature is still unlimited, and the latter proposition cannot be maintained unless this court shall materially modify its holding in *Kalich* v. *Knapp.*

5. It is suggested that the designation of the terminus of the road is indefinite, but we find no such uncertainty as would render the description void.

6. Objections are also suggested as to the validity of the contract with the railroad company for the construction and leasing of the road, but these we deem to be sufficiently met and settled in *Churchill* v. *Grants*

*Pass,* 70 Or. 283 (141 Pac. 164), and will not be further considered. Many objections might be raised to the contract considered as a business proposition, but with this we have nothing to do. The writer ventures the prophecy that in the end the citizens of Roseburg will regret ever having gone into the business of railroad building, but that is their affair exclusively.

7. The attorney for several dissenting taxpayers has appeared *amicus curiae* and attempted to show by affidavit that this is a fictitious suit, in which there is no real controversy between the parties, but is begun and carried on with the intent to have this controversy decided against the plaintiff, insisting that the suit should be dismissed. Our right to do this is un-. doubted, but it is conceived that such a drastic course should not be pursued except where the fictitious character of the alleged controversy appears either from the pleadings or from satisfactory evidence. More especially is this true where the persons so appearing had an opportunity to have been heard in the court below and neglected, as in this case, to avail themselves of it.

8. The plaintiff is a taxpayer of the city, and is not shown to have any financial interest in the proposed contract or in the bond issue outside of the fact that he will be called upon to pay taxes to meet the principal and interest upon the bonds as they mature. Under these circumstances it was his right, and even his duty, to contest the proceedings and have it judicially determined whether or not he might be called upon to pay an illegal tax upon a project that months or years afterward might be thwarted by judicial proceedings. In his complaint, which is brought not only on his own account, but on behalf of all others simi-

77 Or.—14

larly situated, he has pleaded everything necessary to have enabled the parties now appearing *amici curiae* to present the whole case. It was not necessary for him to have pleaded the city charter, because the court will take judicial notice of that; neither was it necessary for him to have pleaded the unconstitutionality of the law of 1915, because the court takes judicial notice of all acts of the legislature. While this is a friendly suit, that is, one pursued without rancor and with the understanding that no unnecessary delays will be permitted, the controversy is none the less real, and we are not disposed to assume that the parties who failed to take advantage of presenting their case in the court below are exercising any greater degree of good faith than plaintiff.

The decree of the Circuit Court is affirmed.

AFFIRMED.

MR. JUSTICE BURNETT dissenting.

---

Motion to dismiss submitted on briefs February 1, denied February 16, 1915.