Argued January 31, reversed March 21, rehearing denied June 6, 1916.

## HUNTER v. ROSEBURG.

(156 Pac. 267; 157 Pac. 1065.)

**Judgment—Conclusiveness—Identity of Questions Involved.**

1. The decree in a suit to test the validity of a city election, at which the city charter was amended to authorize the common council to construct a railroad from the city to a specified point, and to contract for the construction thereof, was not *res adjudicata* in a subsequent suit to cancel contracts entered into by the city which were not executed until after the first suit was instituted and were mentioned therein only in a general way.

Judgment—Conclusiveness—Matters Concluded.

2. Where a case was decided upon demurrer to the complaint, the decree was not *res adjudicata* in a subsequent suit wherein different facts were alleged, issues made up, and testimony taken.

Municipal Corporations—Powers of Common Council—Construction of Charter.

3. An amendment to a city charter authorized the common council to construct a standard gauge "railroad" from the city to a specified point which should be a common carrier for both freight and passenger service, and for that purpose, to issue and sell bonds, and directed the council to contract for the construction thereof, and to lease the railroad upon such terms and for such periods as to it might seem for the best interests of the city. *Held*, that this contemplated a public utility, or a complete railroad to be owned by the city, and did not contemplate the owning or leasing by the city of a part of a railroad for the whole distance, or all of it for a portion of the distance.

Municipal Corporations—Fiscal Management—Loaning Credit to Private Parties.

4. Article XI, Section 9, of the Constitution, provides that no municipal corporation shall become a stockholder or raise money for, or loan its credit to or in aid of any company, corporation or association. An amendment to a city's charter authorized the council to construct a railroad which should be a common carrier, and for that purpose to issue and sell bonds in a sum not exceeding $300,000, and directed the council to contract for the construction of the railroad and to lease it. The council made a contract with a railroad company and a lumber company whereby, in consideration of the construction of the railroad by the railroad company, the city agreed to pay $300,000 in money or bonds, procure the right of way, and lease the road to the railroad company. The contract provided for payment for each mile of road completed and bound the railroad company to furnish all material for operation, maintenance and repair. The lumber corporation agreed to equip a sawmill for operation. The railroad company was given the option to purchase the city's interest subject to the city's right, on notice, to sell to other parties, in which case, any sum realized above the cost, and any deficit in operating or maintaining the road was to be divided, and the lumber company's rights were to be guarded, and it was to have the right to use the railroad. *Held*, that the transaction violated the Constitution and was not authorized by the charter.

Municipal Corporations—Fiscal Management—Loaning Credit to Private Parties.

5. The option given the railroad company to purchase the city's interest for $300,000 at any time within sixty years, though the interest for 60 years would be treble that amount, showed that the city was attempting to raise money for, or loan its credit to or in aid of the corporations.

Municipal Corporations—Fiscal Management—Loaning Credit to Private Parties.

6. The funds of a municipality are for public purposes, and there is an inherent condition attached to all public utilities constructed at

the expense or on the credit of a municipality that they shall be public
in their character.

**Municipal Corporations—Constitutionality of Contracts—Favor · of
Electorate.**

7. In determining the constitutionality of contracts made by a city
for the construction of a railroad, the court cannot notice the fact that
many of the voters of the city are for, and only a few against, the
contracts; the Constitution being a shield with which any citizen may
ward off any attempted invasion of his rights, regardless of the num-
bers interested.

[As to remedies of taxpayer for illegal corporate acts, see note
in 2 Am. St. Rep. 92.]

From Douglas: GEORGE F. SKIPWORTH, Judge.

In Banc.    Statement by MR. JUSTICE BEAN.

This is a suit by John Hunter and other taxpayers
against the City of Roseburg, and others, to cancel two
contracts entered into on July 15, 1915, between the
City of Roseburg, party of the first part, the Roseburg
& Eastern Railroad Company, a corporation, party of
the second part, and the Kendall Lumber Corpora-
tion, party of the third part, and to enjoin the issu-
ance of $300,000 in bonds.    From a decree in favor of
the defendants, plaintiffs appeal.

On June 3, 1915, the legal voters of the City of Rose-
burg amended the charter of that city.    Section 156
thereof reads as follows:

"The common council is hereby granted the power,
in addition to all the other power granted by the
municipal charter of the City of Roseburg, to construct
a standard gauge railroad from the City of Roseburg .
to a point on the North Umpqua River at its intersec-
tion with the western boundary of the Cascade Range
Forest Reserve.    Said railroad shall be a common car-
rier for both freight and passenger service."

Section 157 states:

"For the purpose of raising the necessary funds to
construct said railroad the common council, is hereby
authorized to issue and sell the bonds of the city, bear-

ing 5 per cent interest per annum, in a sum not to exceed three hundred thousand dollars.  Said bonds shall mature and become payable thirty years from the date of their issue and may be paid at any time, the interest is payable after ten years from the date said bonds are issued, at the option of the City of Roseburg.''

The amendment further provides that the common council of the City of Roseburg is directed to enter into a contract for the construction of the railroad mentioned, and to lease the same on such terms and for such periods of time as to it may seem for the best interests of the city; and that the lease shall prescribe that there shall be no discrimination as to either rates or service in the carrying of freight or passengers.  The levy of an annual tax is authorized to pay the interest on the bonds, and, thereafter, a further levy for their payment at maturity.

After the commencement of this suit the case of *Pearce* v. *City of Roseburg,* which was instituted in the Circuit Court on June 8, 1915, for the purpose of testing the validity of the special election mentioned, was decided by this court: See 77 Or. 195 (150 Pac. 855). The decree of the Circuit Court sustaining the demurrer to the complaint was affirmed.  Those matters, therefore, which were included in the complaint in the former case will not be particularly mentioned herein.

The plaintiffs allege that the contracts entered into by the city and the corporations named are not valid, for the reason that they are not authorized by the charter amendment and are repugnant to Article XI, Section 9, of the Constitution of Oregon.  It is specified that the contract does not provide for the construction of a standard gauge railroad from the City of Roseburg to a point on the North Umpqua River at its intersection with the western boundary of the Cascade Range Forest Reserve, and that the city has no

authority to attempt to enter into an agreement for
the construction of only a part of such railroad; that
the contracts attempted to be entered into with the
corporations named are illegal, an abuse of the power
vested in the defendant officers of the city, and an
attempt by subterfuge to tax the taxpayers of the
municipality, including the plaintiffs, for private pur-
poses, in violation of the Constitution of the State of
Oregon, and that of the United States; also, that they
are for the purpose of raising money for, or loaning
credit of the city to or in aid of Kendall Bros., or the
Roseburg & Eastern Railroad Company, or other own-
ers of timber land along the route of the proposed
railroad, in violation of Article XI, Section 9, of the
Constitution.

The prayer of the complaint is that the contracts be
canceled, held for naught, and that the city be enjoined
from attempting to issue or sell the bonds mentioned.

As far as it is deemed necessary to recite, the sub-
stance of the main contract of July 15, 1915, now in
controversy, is as follows:

"Witnesseth, that whereas, the city proposes to con-
struct a railroad of standard gauge and substantial
construction from the City of Roseburg, northeasterly
to the North Umpqua River and thence up the North
Umpqua River to its intersection with the western
boundary of the Umpqua National Forest for the pur-
pose of inducing the location of sawmills at or near
the said City of Roseburg and the delivery to said saw-
mills of timber now standing in said National Forest
and for sale by the United States government; and
also for the purpose of transporting the timber, be-
longing to private individuals, corporations or syndi-
cates tributary to the North Umpqua River and to
Little River; and for the further purpose of affording
to any and all persons, companies and associations
equal transportation facilities for the transportation
of all said sawlogs, timber and other products of the

forests without discrimination either as to rates or . service:

"Now, therefore, in consideration of the railroad company constructing a standard gauge railroad of substantial construction from the City of Roseburg easterly to the North Umpqua River and thence up said river to its intersection with the western boundary of the Umpqua National Forest, the city undertakes and agrees to pay to the railroad company the sum of three hundred thousand dollars ($300,000.00) in lawful money of the United States of America, or in bonds of said city bearing interest at the rate of 5 per cent per annum payable semi-annually at the option of the city, and the city further agrees to provide the right of way for said railroad, said right of way to be of the usual width taking into consideration the nature of the ground through which said right of way has been or shall be hereafter located, and further agrees to lease to said railroad company for a period of sixty years said railroad when the same shall have been constructed."

The contract then provides that the city pay to the railroad company $9,000 per mile for every mile of road completed to Rock Creek, ready for the rolling stock and general traffic; $4,500 per mile for work done at isolated places and disconnected portions; and $11,000 per mile for that portion of the railroad extending from Rock Creek to Umpqua National Forest, when completed. The balance of the sum of $300,000 remaining in the city treasury is directed to be paid to the railroad company as soon as the railroad shall be completed to the National Forest. It is further provided as follows:

"The railroad company for and in consideration of the promises and undertakings of the city agrees to construct a railroad of standard gauge and of substantial construction, with no grade in excess of 2½ per cent from the City of Roseburg to the western bound-

ary of the Umpqua National Forest at its intersection with the North Umpqua River, and to furnish at its own charge and expense all material, depots, sidings, spurs and other conveniences necessary for the proper operation of said railroad for the accommodation of the public as may be required under the law of the state; to fence said railroad right of way; to place thereon leased steel rails weighing not less than 56 pounds per yard; to equip said railroad with the necessary rolling stock; to maintain and keep said railroad in good repair, and operate the same continuously for both passenger and freight service as a common carrier, and to pay the city as a rental the sum of 25 per cent of the net profits earned by said railroad during the term of said lease. Said sum of 25 per cent shall be paid by the railroad company to the city on the first day of August for all sums earned during the six months ending on the thirtieth day of June of each year, and on the first day of February for all sums earned during the six months ending with the thirty-first day of December of each year."

In the stipulation, the railroad company also agrees to transport all the sawlogs and other products of the forests delivered to it at any suitable point on the railroad at a reasonable rate without discrimination. The contract then states:

"The railroad company hereby further agrees to pay all taxes and other public charges of every kind and nature which may be lawfully assessed or levied upon or against said railroad or said city on account of said railroad during the term of said lease. And said railroad company hereby agrees to hold and save harmless the city from all liability on account of any such taxes or public charges during the term of said lease."

It is agreed that active work of construction commence within 30 days and be prosecuted diligently and continuously so far as practicable until the completion of the railroad between the City of Roseburg and Rock

Creek, the same to be continued to the western boundary of the Umpqua National Forest at its intersection with the North Umpqua River, so as to have it completed to that point within five years from the taking effect of the agreement, and as much sooner as there shall be any demand or opportunity for transporting sawlogs or other products of the forest from the National Forest.

It is further specified that the City of Roseburg shall have a voice in fixing the freight rates which may be charged, but does not provide that the municipality shall control the matter. In consideration of the donation of a mill site and the construction of the railroad, the lumber corporation agrees with the city to complete and equip a modern sawmill of certain capacity ready for operation as soon as the railroad shall be finished to Rock Creek; and guarantees the performance of the contract by the railroad company. The agreement continues thus:

"It is further agreed and understood by and between the city and the said railroad company that 'net profits' as herein employed shall be taken to mean all receipts of the said railroad company less the actual expense of operating and maintaining the same, and the taxes lawfully assessed against and levied upon said railroad and its equipment. All sums of money paid out by said railroad company for the lease of said rails and as damages to any persons resulting from the construction, operation and maintenance of said railroad shall be included as operating expenses."

Other provisions of the contract will be noticed hereafter. Another contract was executed by the same parties on the same day stipulating that the contract first mentioned should be placed in escrow in a bank in Roseburg until the city should acquire the right of way for the railroad and the fair-ground site should

be conveyed to the lumber company, and during the pendency of the suit in regard to the bond issue. The proposed railroad is between 32 and 33 miles in length, a distance of 18 or 20 miles on an air line. It appears that the city made no maps, plans or specifications for the construction of the road, and the contract does not provide for the same. The matter is apparently left wholly to the corporations.

In order to further indicate the position of defendants, we find it stated in the brief of the learned counsel that J. L. and A. S. Kendall are large lumber manufacturers owning an extensive tract of timber tributary to North Umpqua River east of Roseburg, and that they were induced by the citizens of Roseburg to consider the proposition of establishing a sawmill in that locality. It appears that there are other immense tracts of timber in that vicinity, a large part of which are in the National Forest, subject to sale. We quote from the brief of defendants as follows:

"The interest of the city in the matter is to cause to be established in its vicinity sawmills and kindred enterprises for the manufacture of that timber into the useful products for which it is fitted. In order to secure the enterprises at all near Roseburg it is necessary to have a way of transporting the logs from the mountains to the city. The Kendalls were induced by the citizens of Roseburg to agree to establish a sawmill at Roseburg on condition of the construction of a railroad from Roseburg to the National Forest by the city."

The defendants state that there was no attempt in the contract to go into the details of the building of the roadbed or to prescribe its equipment minutely, "nor was there any necessity for that." The design of the city was to secure the construction of a standard gauge railroad substantially completed and prop-

erly equipped to take care of the traffic which would be offered to it. By leasing the railroad to the company for 60 years, the defendants say it would be of interest to the railroad company to properly construct and maintain the same:

"In all probability [quoting from defendants' brief] every tie that is used in the construction of this railroad, every rail that will be placed upon the ties, and every bolt, fish-plate, and all other appliances, will have been worn out before the expiration of the sixty years. * * "

It is contended by the defendants that the city will be the absolute owner, with the exception of the leased rails                    REVERSED. REHEARING DENIED.

For appellants there was a brief and an oral argument by *Mr. Ralph R. Duniway.*

For respondents there was a brief over the names of *Messrs. Rice & Orcutt, Mr. Carl E. Wimberly, Mr. Albert Abraham* and *Mr. Oliver P. Coshow,* with oral arguments by *Mr. Dexter Rice* and *Mr. Wimberly.*

MR. JUSTICE BEAN delivered the opinion of the court.

It is contended upon the part of the plaintiffs: (1) That the contract executed on July 15, 1915, is not one authorized by the charter amendment. (2) That in order to comply with the charter the contract should provide that the city will construct and own by the issuing of bonds in the sum of not more than $300,000 a standard gauge railroad between the points of termini named. (3) That a grade for a logging road and some ties do not constitute a standard gauge railroad; that such a railroad between given points requires that there be the right of way, the grade, the ties, the ballasting, the rails, the spikes, the plates con-

necting the rails, the rolling stock, the depots, the repair-shops, and in fact everything that is necessary to a going operating railroad—citing 4 Words and Phrases (2 ed.), pp. 95–102; *Thompson-Houston Co.* v. *Simon,* 20 Or. 60, 68 (25 Pac. 147, 23 Am. St. Rep. 86, 10 L. R. A. 251); *Oswego D. & R. Ry. Co.* v. *Cobb,* 66 Or. 587, 592 (135 Pac. 181), and other authorities. (4) That the charter amendment and the contract are an attempt to evade, and are in conflict with, Article XI, Section 9, of the Constitution of Oregon, by providing a commingling of city and private funds into a partnership in a sawmill and logging railroad project for the benefit of the corporations.

It is pleaded and contended on the part of defendants that the contract in question was adjudicated in *Pearce* v. *Roseburg,* 77 Or. 195 (150 Pac. 855). They submit that the agreement executed by the city council is in conformity with the charter amendment, and is not repugnant to the Constitution; that the railroad is all owned in fee simple by the City of Roseburg, and that there is no mingling of private and public funds.

1, 2. The case of *Pearce* v. *Roseburg* was decided upon a demurrer to the complaint; therefore the only matters that were determined were those contained in that pleading. The contract in question was not executed until after the former suit was instituted, and was mentioned therein only in a general way. But the material provisions which are opposed in the present suit were not set forth in the former. Naturally, the details of that instrument could not be given when it was not in existence. The contract is set out *in haec verba* in the complaint in this case, and there are many facts detailed which were not contained in the former adjudication. Summarizing, this litigation may be distinguished from the former as follows: (1)

The parties are not the same; (2) The issues are not the same; (3) The subject matter of the suit, to wit, the contract of July 15, 1915, was not in existence at the time the former suit was begun nor when it was decided by the Circuit Court: See 23 Cyc. 1172. The case of *Pearce* v. *Roseburg* having been decided upon demurrer to the complaint, the decree therein is not *res adjudicata* of the present suit, wherein different facts are alleged, issues made up and testimony taken: *O'Hara* v. *Parker,* 27 Or. 156, 163 (39 Pac. 1004); *Pruitt* v. *Muldrick,* 39 Or. 353, 358 (65 Pac. 20); *Hoover* v. *King,* 43 Or. 281 (72 Pac. 880, 99 Am. St. Rep. 754, 65 L. R. A. 790); *Burnett* v. *Marrs,* 62 Or. 601 (125 Pac. 838); *Gould* v. *Evansville & C. R. R. Co.,* 91 U. S. 526, 534 (23 L. Ed. 416); 23 Cyc. 1155; 24 Am. & Eng. Ency. of Law (2 ed.), p. 769).

3. It will be necessary, therefore, to consider the contract as set forth in the complaint and referred to in the answer. First, it should be noticed that by the language of the charter amendment the common council of the City of Roseburg is granted power to construct a standard gauge railroad which shall be a common carrier from the city to a certain point on the western boundary of the Cascade Range Forest Reserve, and for that purpose to issue $300,000 in 5 per cent bonds, payable in 30 years, and which may at the option of the city be paid in 10 years. The council is directed to enter into a contract for the construction of the railroad and permitted to lease the same. The charter authorizes the levy of an annual tax for the payment of the interest and principal of the bonds. It makes plain provisions for a public utility, that is, for a complete railroad to be owned by the city. It does not contemplate that the municipality shall own or lease a part of a railroad for the whole of the dis-

tance, nor all of it for a portion of the distance. An examination of the different provisions of the contract executed by the city and the corporations discloses that the former is not to own all the railroad, and, except upon certain contingencies which may or may not arise, it is at least doubtful if it is intended by the terms of the contract that eventually, or at the end of the term of the lease, the municipality shall have the benefit of any considerable portion thereof other than the right of way and roadbed of an abandoned logging railroad.

4. Viewing the matter in the light most favorable to the city, we find that after the road is completed the railroad company has the right to purchase its interest in the road at any time within 60 years for the sum of $300,000. This option is subject to the right of the city, in case it has an opportunity to sell the road and after 90 days' notice to the railroad company, that company failing to exercise its option, to sell to any purchaser "subject to the right of the contracting parties as herein defined." It is mutually understood that in case of sale by either of the contracting parties during the term of the lease, any sum realized in excess of the cost of constructing and equipping, and any deficit incurred in operating and maintaining the railroad, shall be divided between the city and the railroad company in proportion to their investments therein. (No provision appears to be made in case of loss or sale for less than cost.) This stipulation clearly shows that the railroad company owns an interest in the road. The contract provides that in case of sale by either party the interest of both shall be carefully guarded so as to secure to the lumber corporation the delivery of sawlogs at its mills upon just and equitable rates. It stipulates that:

"The lumber corporation may have the right to use said railroad to skid and load logs and other timber and transport them in its own cars and with its own locomotives or other power to its own mills on or along said railroad constructed at the time of said sale upon payment of a reasonable compensation for such privilege."

It is clear that the city's interests are closely entwined with those of the other two contracting parties. A sale cannot be made by the municipality without amicable arrangements being made with the other parties. Its funds are proposed to be commingled with other private funds. The interests of the city and the railroad company are interdependent. The city stands sponsor for the payment of the principal and interest of the bonds, and its credit and funds would certainly be utilized for the benefit of the railroad company. The project may be well described as a partnership transaction.

The evidence in the case shows that the estimated cost of the railroad is between $600,000 and $750,000. The contract as executed is not one authorized by the charter as amended by the legal voters. In other words, the legal voters of Roseburg did not vote to issue bonds either partially or wholly for the benefit of any persons or corporations other than the city. Article XI, Section 9, of the Constitution of Oregon is as follows:

"No county, city, town, or other municipal corporation, by vote of its citizens or otherwise, shall become a stockholder in any joint stock company, corporation, or association whatever, or raise money for, or loan its credit to, or in aid of, any such company, corporation, or association."

Section 5 of the same article emphasizes this provision. It directs that:

"Acts of legislative assembly incorporating towns and cities shall restrict their powers of taxation, borrowing money, contracting debts, and loaning their credit."

The cases are not numerous in which the courts have considered the question of the right of a municipality to have a part ownership of property. That of *Alter* v. *Cincinnati*, 56 Ohio St. 47, 60 (35 L. R. A. 737, note), plainly lays down the rule that:

"There can be no union of public and private funds or credit nor of that which is produced by such funds or credit."

The basis of this doctrine is the provision of the Ohio Constitution, Article VIII, Section 6, which is as follows:

"The General Assembly shall never authorize any county, city, town, or township, by vote of its citizens or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or loan its credit to, or in aid of, any such company, corporation, or association."

This language is practically identical with Section 9, Article XI, of our Constitution. This constitutional provision of Ohio was interpreted in *Walker* v. *Cincinnati*, 21 Ohio St. 15 (8 Am. Rep. 24), as follows:

"The mischief which this section interdicts is a business partnership between a municipality or subdivision of the state, and individuals, or private corporations or associations. It forbids the union of public and private capital or credit in any enterprise whatever."

The statute under consideration in that case was held constitutional because the court did not consider that it violated the Constitution as thus interpreted. In later cases in that state, however, statutes have been held unconstitutional by application of the same

doctrine: *Taylor* v. *Ross County Commissioners,* 23 Ohio St. 22; *Wyscaver* v. *Atkinson,* 37 Ohio St. 97. *Pleasant Township* v. *Aetna Life Ins. Co.,* 138 U. S. 74 (34 L. Ed. 864, 11 Sup. Ct. Rep. 215), is a case where the prohibition of the mingling of public and private funds is approved.

The written Constitution of Oregon is the most solemn declaration of the people in regard to the powers of the state and its agencies or municipalities. It has their unqualified approval. The authorized officers in the state are required to take an oath to support it before they are qualified to enter upon their work. It is not a pleasurable duty to curb the action of the municipal officers of an enterprising city when they transcend the limits of their municipal charter or of our organic law, yet the courts cannot shirk such duty when the case demands. In determining a question under the Constitution, the scope and effect of an act or contract are proper for consideration. The view of the court is never limited to the mere letter. The agreement above noted is inimical to Article XI, Section 9, and should be so declared.

There are some phases of the contract, the preamble and other provisions, which strongly indicate that the main purpose thereof on the part of the municipal officers is to obtain the location and operation of sawmills near the city and to accelerate the general business of the community, with little, if any expectation by them of any other return of the funds to be invested. The agreement that in case of the sale of the railroad the lumber corporation shall have the right to use the road for the transportation of its timber on cars and with engines of its own would, under ordinary business conditions, prevent any such sale. The lumber company appears to be the principal pros-

pective user of the road. There are no provisions
as to fixing rates so that the city could reasonably
expect that the lumber corporation, or its ally, the rail-
road company, would so adjust the rates for carrying
logs that there would be any "net profits" to aid the
municipality in liquidating the interest on the bonds.
The time of the operation of the proposed railroad
and sawmill is not definitely agreed upon, but is left
to the good faith of the Kendall brothers in a general
way, as are many other essential arrangements.
Whatever their intentions may be, their stock in the
corporations is subject to transfer at any time. In
short, the whole scheme seems to contemplate a tem-
porary utility such as logging railroads usually are.
With the timber transported, and the leased rails and
the equipment belonging to the corporations removed,
the city would have a roadbed, some old ties, and a
fenced right of way left which, under ordinary condi-
tions would be of but little value, a mere shell: See
*Avery* v. *Job,* 25 Or. 512, 525 (36 Pac. 293).

5, 6. Another phase of the proposition is that if the
road should be somewhat permanently constructed and
equipped, the interest on $300,000 at 5 per cent per
annum for 60 years would be treble that amount, or
$900,000. Immediately before the end of that period
the company would have the right to purchase from
the city for the smaller figure named, while the latter
might be required to pay approximately the larger
amount. Under such circumstances, can it be said
that the city is not attempting to raise money for, or
loan its credit to, or in aid of, the corporations?
Viewed from any standpoint indicated by the contract
it is a plain violation of our organic law. The funds
of a municipality are for public purposes. There is
the inherent condition attached to all public utilities

constructed at the expense or on the credit of a municipality that they shall be public in their character: 3 Dillon, Mun. Corp. (5 ed.), § 1293. At the close of this section it is stated thus:

"If the enterprise is of such a character that it may justly be described as indicating an underlying purpose different from the city's use and convenience, and creates in the impartial mind a conviction that the use and benefit of the city are but pretexts disguising some foreign and ulterior end, the attributes of a city purpose must be denied to it."

It follows that the decree of the lower court must be reversed and one entered here declaring the contracts mentioned void, enjoining the enforcement thereof, and inhibiting the issuance of the $300,000 in bonds. It is so ordered.     REVERSED. REHEARING DENIED.

MR. JUSTICE EAKIN took no part in the consideration of this case.

---

Denied June 6, 1916.

ON PETITION FOR REHEARING.

(157 Pac. 1065.)

*Mr. Carl E. Wimberly, Mr. Albert Abraham, Messrs. Rice & Orcutt* and *Mr. Oliver P. Coshow,* for the petition.

*Mr. Ralph R. Duniway, contra.*

In Banc.   MR. JUSTICE HARRIS delivered the opinion of the court.

7. Much space is given in the 60 pages of the petition for a rehearing to a discussion of the benefits to

be derived from the proposed railroad, and emphasis is placed upon the fact that the taxpayers have by a large majority voted for the improvement. The court, however, can neither inquire whether the railroad promises to be a paying or losing investment, nor ask whether a few or many want the improvement. The wisdom of constructing the proposed railroad is a question which must be asked and answered by no one except the voters in Roseburg; and the fact that there are many for and only a few against the contracts cannot even be noticed in determining the question of the legality of the contracts. The Constitution is a shield with which any citizen may ward off any attempted invasion of his rights, regardless of the numbers who may be interested. The prominent question presented by this litigation is whether the contracts signed by the City of Roseburg, the Roseburg & Eastern Railroad Company and the Kendall Lumber Corporation are illegal; and we concluded that the contracts are illegal because they infringe upon the Constitution. On account of the importance of the questions involved we have for the second time given much attention to a consideration of them, notwithstanding the fact that the opinion delivered by Mr. Justice BEAN expressed the conclusions at which we arrived after deliberating upon every phase of the legal questions presented by this litigation. After again examining the contentions made in the record, we have reached the same conclusions at which we hitherto arrived, and we still adhere to the reasoning and conclusion of the original opinion holding that the contracts are in violation of the Constitution.

The petitioners express some concern lest the original opinion might be misunderstood when, after directing the entry of a decree voiding the contracts, it con-

cludes by "inhibiting the issuance of the $300,000 in bonds." The opinion in *Pearce* v. *Roseburg*, 77 Or. 195 (150 Pac. 855), establishes the validity of the charter amendment. The opinion in *Hunter* v. *Roseburg*, *ante*, p. 588 (156 Pac. 267), goes no further than to hold that the contracts signed by the city, the railroad company, and the lumber company violated stated provisions of the Constitution, and therefore the issuance of bonds in furtherance of those illegal contracts was inhibited. The amendment to the charter being legal, the city would have the right to exercise the power conferred by the amendment. The opinion does not contain any language which prohibits the issuance of bonds to carry out a legal contract. With a valid charter and given a legal contract for the construction of a railroad, the city could issue bonds to carry out such a contract because Section 157 of the charter authorizes the common council to issue bonds of the city "for the purpose of raising the necessary funds to construct said railroad."

The petition for a rehearing is denied.

REHEARING DENIED.

MR. JUSTICE EAKIN absent.