**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>PORT OF PORTLAND;<br>COMMISSIONERS OF THE PORT OF PORTLAND, in their individual and official capacities; BILL WYATT, in his individual and official capacity; BRUCE A. HOLTE,<br>*Defendants-Appellees.* | No. 14-35376<br><br>D.C. No.<br>3:12-cv-01494-SI<br><br>CERTIFICATION<br>ORDER |

Filed December 27, 2016

Before: Richard R. Clifton, Mary H. Murguia,
and Jacqueline H. Nguyen, Circuit Judges.

# SUMMARY[*]

## Civil Rights

The panel certified to the Oregon Supreme Court the following question:

> Does a municipal corporation that holds its tax and non-tax revenues in the same bank account but that segregates the revenues through financial management and accounting techniques violate article XI, section 9, of the Oregon Constitution when the municipal corporation uses its funds to finance programs that benefit private enterprise if the programs contain neither, one, or both of the following two contractual provisions: (1) the municipal corporation certifies that it will not use tax revenue to fund the programs; (2) the program beneficiaries waive any right to make a claim against the municipal corporation's tax revenue to satisfy the municipal corporation's program obligations?

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Andrew J. Ziaja (argued), Emily M. Maglio, and Robert S. Remar, Leonard Carder LLP, San Francisco, California, for Plaintiff-Appellant.

Randolph C. Foster (argued) and Jeremy D. Sacks, Stoel Rives LLP, Portland, Oregon, for Defendants-Appellants.

**ORDER**

MURGUIA, Circuit Judge:

The Oregon Constitution bars a state public entity, such as a municipal corporation, from "rais[ing] money for, or loan[ing] its credit to, or in aid of, any [] company, corporation or association." OR. CONST. art. XI, § 9 ("Section 9"). It is well-settled law in Oregon that a municipal corporation's sale of revenue bonds does not violate Section 9's prohibition against raising money for or lending credit to a private enterprise. *See, e.g.*, *Miles v. City of Eugene*, 451 P.2d 59, 62 (Or. 1969) ("Money coming from revenue bonds and not from tax money does not fall within the prohibition."). But what about non-revenue bond programs? Can an Oregon municipal corporation adequately protect tax revenue as Section 9 requires by employing accounting and financial management methods? Or are the structural protections of revenue bonds necessary to avoid running afoul of Section 9?

In this case, the Port of Portland ("Port"), an Oregon municipal corporation, developed, funded, and implemented four programs (collectively the "Programs") to mitigate financial losses at the Port's Terminal 6. The Port funded

the Programs out of a bank account that contained tax and non-tax revenue. The Port has demonstrated that, as a factual matter, its accounting and financial management systems adequately tracked, managed, and segregated the tax and non-tax revenues. But this court has been unable to find, and the parties have not identified, any Oregon case law that discusses whether such accounting methods may allow the Programs to survive Section 9 scrutiny. The financial management systems and contractual arrangements employed by the Port to fund the Programs are qualitatively different than the systems and arrangements used by municipal corporations to fund programs through the sale of revenue bonds. We are hesitant to expand Oregon law in a manner that may be contrary to Oregon's wishes[1] and in an important subject matter in Oregon's history.[2]

---

[1] This case comes to us after the district court dismissed the single federal claim and maintained supplemental jurisdiction over the remaining state law claim. Once the district court dismissed the federal claim, the court could have declined to exercise supplemental jurisdiction over the remaining Section 9 state law claim. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) ("A district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" (quoting 28 U.S.C. § 1367(c)(3))). This court has advised that when all federal law claims are eliminated before trial, the district court is "duty-bound to take seriously" the responsibility to decline or retain jurisdiction over any remaining state law claims. *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc). However, the district court is not required to *sua sponte* analyze whether it should decline to exercise supplemental jurisdiction, *id.*, and there is no evidence that either party raised the issue.

[2] Constitutional provisions like Section 9 were added to state constitutions after local government efforts to attract private enterprise, mostly railroad companies, by providing tax benefits and subsidies to

For these reasons, pursuant to Oregon's Uniform Certification of Questions of Law Act, OR. REV. STAT. §§ 28.200–.255, we respectfully certify to the Oregon Supreme Court the question of law set forth in Part III of this order.  The answer to this question of law may be determinative of the case pending before this court and there is no clearly controlling precedent in the decisions of the Oregon Supreme Court or Oregon Court of Appeals.

## I.  Background

This case arises from a labor dispute between plaintiff-appellant International Longshore and Warehouse Union ("ILWU") and defendant-appellee the Port over whether ILWU or another labor organization should have been assigned work related to refrigerated shipping containers at Terminal 6 of the Port.  The dispute caused financial losses to the Port and to ICTSI Oregon, Inc. ("ICTSI"), which manages and operates Terminal 6 pursuant to a lease agreement with the Port.  Concerned with the economic impact of the work slowdown, the Port approved, funded, and implemented four incentive and subsidy programs to keep Terminal 6 operating at financially sustainable levels.

Under the 2012 Carrier Program, the Port offered to make fixed "Program Payments" to certain carriers if they made a call at Terminal 6 during a four-week period.  The Port made three payments under the 2012 Carrier Program totaling $175,000.  The 2012 Carrier Program did not contain any agreement between the Port and the carriers that participated in the Program regarding whether or not tax revenue would be used to fund the Program or whether the

them went awry and required general taxpayers to cover the defaulted loans.  *See Carruthers v. Port of Astoria*, 438 P.2d 725, 727 (Or. 1968).

carriers could make claims against the Port's tax revenue to satisfy the Port's obligations under the Program.

The Port adopted the 2012 Rent Program on August 8, 2012. Under the 2012 Rent Program, the Port agreed to reimburse ICTSI fifty percent of certain costs related to the labor dispute incurred by ICTSI between June 1, 2012, and the earliest of several possible dates or events. The amount was capped at $4,664,356, which was the amount of rent otherwise due from ICTSI. The Port and ICTSI entered into a supplemental agreement on October 26, 2012, under which ICTSI agreed that the Port had not pledged tax revenue to finance the 2012 Rent Program and ICTSI waived any right to make claims against the Port's tax revenue to satisfy the Port's obligations under the Program. The Port paid $2,688,672 to ICTSI under the 2012 Rent Program.

The labor dispute continued through 2012 and into 2013, so the Port adopted two new programs: the 2013 Carrier Program and the 2013 Rent Program. The 2013 Carrier Program was authorized by the Port Commissioners on January 9, 2013. The 2013 Carrier Program authorized $10 per-container incentive payments to carriers who called on Terminal 6. The Program was capped at $1,000,000 and terminated at the end of 2013. The payments were to be made with non-tax revenues, specifically the rent received from ICTSI between 2012 and 2013. Each carrier participant was required to acknowledge that no tax revenue was used to fund the 2013 Carrier Program and to waive any right to make a claim against the Port's tax revenue to satisfy any of the Port's obligations under the Program. The 2013 Carrier Program payments totaled $631,620.

Finally, the Port adopted the 2013 Rent Program on February 13, 2013, under which the Port agreed to make rent rebate payments to ICTSI in the amount of $308,333 per

month during 2013. The agreement stated that the sole source of funding for the 2013 Rent Program would be the annual rent payments paid to the Port by ICTSI. ICTSI disclaimed any right to the Port's tax revenues to satisfy the Port's rebate obligations. The 2013 Rent Program was capped at $3,700,000.

ILWU's initial federal complaint alleged violations of 42 U.S.C. § 1983 and Section 9. The district court dismissed the federal claim with prejudice, and proceeded on to the cross-motions for summary judgment with respect to the Section 9 claim. The district court granted summary judgment in favor of the Port, and ILWU filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291 and review the district court's ruling on cross-motions for summary judgment *de novo*. *Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011).

## II. Discussion

The most relevant case here is *Carruthers v. Port of Astoria*, 438 P.2d 725 (Or. 1968). *Carruthers* involved a Section 9 challenge to the Port of Astoria's sale of municipal revenue bonds to finance the construction of facilities that would be used to reduce aluminum ore to aluminum. *Carruthers*, 438 P.2d at 726. The facilities were to be used by a private entity, the Northwest Aluminum Company, Inc. ("Northwest Aluminum"). *Id.* The Oregon Supreme Court ultimately ruled that the sale of revenue bonds by the Port of Astoria did not violate Section 9, concluding that "[t]here seems no way, under this proposal, . . . by which the taxpayers or other property of the Port may be held generally accountable in taxes or otherwise in the event of default." *Id.* at 729. The court reached this conclusion for several reasons. First, the sale of bonds by an Oregon port to

construct a plant "suitable for use by any industry" was specifically authorized by then-applicable Oregon statutes. *Id.* at 726 (quoting OR. REV. STAT. § 777.130). The then-applicable statute stated that bonds sold under this provision "shall not in any manner or to any extent be a general obligation of the port issuing the bonds nor a charge upon the tax revenues of such port, nor a charge upon any other revenues or property not specifically pledged thereto." *Id.* (quoting OR. REV. STAT. § 777.560). The statutory bar was expressly included in Northwest Aluminum's agreement. *Id.* at 729. Additionally, Northwest Aluminum's agreement stated that its obligation to pay rent was "unconditional until the bonds are paid in full or adequate provision has been made for such payment." *Id*. The bonds were to be paid solely from the money derived from Northwest Aluminum's lease of the project. *Id.* The agreement also created a special fund to receive rental and other payments by Northwest Aluminum and from which the Port of Astoria would pay the interest and principal on the bonds. *Id.* Lastly, Northwest Aluminum was required to insure the project against loss. *Id.*

The *Carruthers* court considered the argument that there may be some way to recover from the taxpayers in the event of a default by the Port of Astoria. *Id.* at 729–30. Specifically, Oregon law at the time permitted a creditor to recover against a municipal corporation if the municipal corporation's officers acted negligently or the city breached the contract. *Id.* (citing *Public Market Co. of Portland v. City of Portland*, 138 P.2d 916 (Or. 1943) and *Morris v. City of Sheridan*, 167 P. 593 (Or. 1917)). But the court dismissed this possibility, finding that prospective bond purchasers would be on notice when they purchased the bonds that their only recourse in the event of default was against Northwest Aluminum. *Id.* at 730.

In another important Section 9 case, the City of Eugene was permitted to raise funds through revenue bonds to jointly acquire and operate a nuclear power plant with a private utility. *Miles v. City of Eugene*, 451 P.2d 59, 64 (Or. 1969). Just as in *Carruthers*, the Oregon legislature had authorized by statute municipal corporations to sell revenue bonds to raise money to fund joint power facilities. *Id.* at 60 (citing OR. REV. STAT. § 225.450 *et seq.*). And, as in any sale of revenue bonds, the city's general tax obligations were not exposed. *Id.* at 61.

*Carruthers* and *Miles* contrast with *Hunter v. City of Roseburg*, 156 P. 267 (Or. 1916). In *Hunter*, the Oregon Supreme Court invalidated the City of Roseburg's attempts to issue bonds to fund the construction of a railroad that would be used by private railroad and lumber companies. *Id.* at 272. The city had proposed an annual tax to pay the interest on the bonds and a further levy to pay for the bonds at maturity. *Id.* at 268, 271. Though the court recognized that the project aimed to accelerate the general business of the community, the court concluded that the agreement was "inimical to article 11, [Section 9]" because it expended general tax revenues in support of private enterprise. *Id.* at 272.

Thus, it appears to be well-settled law in Oregon that a municipal corporation's sale of revenue bonds does not violate Section 9's prohibition on raising money for or lending credit to a private enterprise, whereas a municipal corporation's sale of general obligation bonds may violate Section 9. *See Miles*, 451 P.2d at 64 (concluding that Section 9 does not prohibit a city from using funds derived from selling revenue bonds and distinguishing *Miles* and *Carruthers* from *Hunter* because the city in *Hunter* "was

proposing to finance the construction of a railroad with general obligation bonds payable from general tax levies").

The programs in *Miles* and *Carruthers* survived Section 9 challenges in part because the funding was derived from revenue bonds, which do not expose tax revenues, and because the programs were authorized by statute. Here, the Port did not sell revenue bonds to fund the Programs, and the Programs were not specifically authorized by statute. Additionally, in *Carruthers*, there were provisions in the statute and in the agreement with Northwest Aluminum that made clear that the bonds sold would not extend to a general obligation, thereby potentially exposing the Port of Astoria's tax revenue. *Carruthers*, 438 P.2d. at 726, 729. There is no evidence that the 2012 Carrier Program contained a similar waiver, and the 2012 Rent Program added one in a supplemental agreement with ICTSI approximately two months after the 2012 Rent Program was authorized. The 2013 Programs contained such waivers. At oral argument, counsel for the Port argued that the Port imposed these additional requirements on the later programs in an abundance of caution. But the distinctions between the programs in *Miles* and *Carruthers* and the Programs in this case may be significant enough for a court to conclude that the Port failed to implement adequate tax revenue protections in some or all of the Programs.

On the other hand, the Port employed various accounting and budgetary measures to segregate tax revenue from non-tax revenue. Such accounting measures were not considered in *Carruthers* or *Miles*, and as far as we can tell, have never been considered in Oregon case law. Neither *Carruthers* nor *Miles* specify exactly what procedures are necessary to adequately protect tax revenues. It would not be unreasonable for a court to conclude that the financial and

accounting mechanisms in place—in combination with the tax revenue disclosures and waivers in place for the 2013 Programs and for part of the 2012 Rent Program[3]—are enough to survive Section 9 scrutiny. But given that the structure of the Programs is categorically different than the structure of the revenue bond programs that have been the focus of previous Section 9 rulings by the Oregon courts, we conclude it is best to ask the Oregon courts to resolve whether the Port's Programs adequately protected tax revenue as required by Section 9.

### III.    Question Certified to the Oregon Supreme Court

For the reasons stated above, we respectfully certify the following question to the Oregon Supreme Court:

> Does a municipal corporation that holds its tax and non-tax revenues in the same bank account but that segregates the revenues through financial management and accounting techniques violate article XI, section 9, of the Oregon Constitution when the municipal corporation uses its funds to finance programs that benefit private enterprise if the programs contain neither, one, or both of the following two contractual provisions: (1) the municipal corporation certifies that it will not use tax revenue to fund the programs; (2) the program beneficiaries waive any right to make a claim against the municipal corporation's tax

---

[3] Again, we note that there was no disclosure and waiver in the 2012 Carrier Program and for the first two months of the 2012 Rent Program.

revenue to satisfy the municipal corporation's program obligations?

We respectfully ask the Oregon Supreme Court to exercise its discretionary authority to accept and decide this question. Our phrasing of the question should not restrict the Oregon Supreme Court's consideration of the issues involved, and "we recognize that [the Oregon Supreme Court] may reformulate the question." *Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 763 F.3d 1232, 1235 (9th Cir. 2014). If the Oregon Supreme Court declines certification, we will resolve the question according to our best understanding of Oregon law.

Further proceedings in this court are stayed pending receipt of the answer to the certified question. The clerk of this court shall forward a copy of this order, under official seal, to the Oregon Supreme Court, along with copies of all briefs and excerpts of record that have been filed with this court. The parties shall notify the clerk of this court within one week of any decision by the Oregon Supreme Court to accept or decline certification. If the Oregon Supreme Court accepts certification, the parties shall then notify the clerk of this court within one week of the issuance of that court's opinion.

**IT IS SO ORDERED**

Mary H. Murgia
United States Circuit Judge, Presiding