Argued March 4, affirmed March 20, 1968

CARRUTHERS, *Appellant, v.* PORT OF
ASTORIA ET AL, *Respondents.*

438 P. 2d 725

*Leo Levenson,* Portland, argued the cause and filed the briefs for appellant.

*Thomas J. White,* Portland, and *George C. Fulton,* Astoria, argued the cause for respondents. With them on the brief were Anderson, Fulton and Lavis, Astoria; E. Wayne Cordes and White, Sutherland and Gilbertson, Portland; William H. Cannon and Nixon, Mudge, Rose, Guthrie, Alexander and Mitchell, New York, New York.

Herbert M. Schwab, Gerard K. Drummond and Rives & Schwab, Portland, filed a brief for Oregon State Public Port Authorities Association as amicus curiae.

Geo. A. Rhoten, Acting Special Assistant Attorney General, Salem, filed a brief in behalf of Oregon Department of Commerce-Economic Development Division as amicus curiae.

Before PERRY, Chief Justice, and McALLISTER, *O'CONNELL, GOODWIN, DENECKE, LUSK and LANGTRY, Justices.

LANGTRY, J. (Pro Tempore).

This case tests the validity of action of the Port of Astoria, a municipal corporation, to effect the sale of $142,000,000① in revenue bonds to finance building,

---

\* O'Connell, J., did not participate in this decision.

① Bache's letter of commitment dated August 1, 1967, states the amount of bonds is "an approximate amount of $142,000,000." Northwest's letter of commitment dated August 31, 1967, states the port will authorize issuance of '$152,000,000 in such bonds.

within the area of the port district, wharves, conveyors and plant to be used generally in reducing aluminum ore to aluminum. The state statutes authorizing such action also are tested in this proceeding. The facilities would be constructed to specifications of Northwest Aluminum Company, a Delaware corporation, which has committed itself to lease and operate the entire plant for a period of 25 years, with an option to purchase it for $50,000 at the end of that period. Consideration for the lease would be rentals in a sum to insure repayment of the revenue bonds and interest thereon over their life span, which also is to be 25 years.

The bonds will specify the same restrictions as those contained in the enabling act. They are in pertinent part:

ORS 777.130. "Any port may:

"* * * * *

"(15) Construct [a plant] * * * suitable for use by any industry for the manufacturing, refining, processing or assembling of any * * * mining or other products * * * with full power to lease and sell the same * * * and * * * pledge or mortgage such buildings, improvements or properties, including any land * * * for the benefit of the holders of revenue bonds issued therefor."

ORS 777.560. "For the purpose of carrying into effect all or any of the powers granted to ports, and to provide funds * * * for industrial uses and purposes, ports may * * * issue and sell revenue bonds without * * * voters * * * authorizing * * *. Such revenue bonds shall not in any manner or to any extent be a general obligation of the port issuing the bonds nor a charge upon the tax revenues of such port, nor a charge upon any other revenues or property * * * not specifically pledged thereto."

ORS 777.565. "* * * [W]ith respect to revenue bonds issued to finance a facility * * * authorized by subsection (15) of ORS 777.130, the board [of the port] * * * may only pledge or mortgage such [improvement and land] for the benefit of the holders of revenue bonds issued therefor * * *."

Bache & Co., Inc., a New York Wall Street investment corporation, is associated with Northwest Aluminum Company, Inc. in this venture and has agreed to underwrite the bond issue when the bonds are found to be marketable. See note 1, supra. The obligation of Northwest Aluminum to pay rentals will be unconditional until the bonds are paid in full or adequate provisions are made for payment "notwithstanding that the project is never completed, is totally destroyed, or never produces alumina or aluminum."

The challenge to the proposed proceedings seeks a judgment holding that the action of the port, and the above statutes authorizing it, are in violation of §§ 7 and 9, Art. XI of the Oregon Constitution, and also that a public purpose is not involved. Such a proceeding is authorized under ORS ch 27, which provides for the determination of such questions in controversy without action or suit. Judgment of the circuit court rejected the challenge in all respects and plaintiff has appealed therefrom.

Section 7, Art. XI of the Oregon Constitution forbids the state to lend its credit except in certain restricted ways.

Section 9, Art. XI of the 1859 Constitution provided:

"No * * * municipal corporation * * * shall * * * raise money for, or loan its credit

to, or in aid of any  *  *  *  company, corporation or association."

In 1917, without changing the above language, a regularly adopted addition to § 9 authorized port districts, pursuant to statute, to "raise money and expend the same in the form of a bonus to aid in establishing water transportation lines  *  *  *."

■ Since the start of the 20th Century, it has been settled that public funds cannot be expended for other than a public purpose. *Hunter v. Roseburg,* 80 Or 588, 156 P 267, 157 P 1065 (1916); *Churchill v. Grants Pass,* 70 Or 283, 141 P 164 (1914); Note, 59 Colum L Rev 618, 622-23 (1959); Note, 66 Harv L Rev 898, 900-01 (1953).

If it be conceded that the language of the statutes, the bonds, the lease, and the procedural ordinances of the port accomplish the stated purpose of unconditionally limiting the repayment of the revenue bonds to the proceeds of the lease of the project they finance, it would appear Northwest Aluminum's purpose in this financing procedure is to obtain a low interest rate on borrowed money.[2]

The interest income from municipal bonds is exempt from federal income taxation. Therefore, the holders of such bonds, not being required to pay income taxes on the interest they receive, buy the bonds even though they return a lesser interest rate than other in-

---

[2] Note and Comment, The "Public Purpose" of Municipal Financing for Industrial Development, 70 Yale L J 789, 791 (1961) states that another incentive for the private corporation to enter into such arrangements may be exemption from local property taxes and "sale and leaseback" advantages that were allowed in the Internal Revenue Code of 1954. Perhaps these, or other related advantages would be sufficient to induce an industry to proceed under such a plan if the municipal bond income tax exemption were withdrawn by Federal act or order.

vestments.[9] Thus the ultimate result is to reduce the cost of borrowing money to private firms such as Northwest Aluminum.

This method of financing industrial plants frequently is used in other states; the motives being the same—an interest saving on financing money to the industry on the one hand, and an expansion of industry and economy of the area which lends its tax-saving advantage on the other. See Note, 47 Yale L J 1412 (1938). (This article in 1938 correctly forecast proliferation of the plan.); Armstrong, "Municipal Inducements"—The New Mexico Commercial and Industrial Project Revenue Bond Act, 48 Calif L Rev 58 (1960); Note, 59 Colum L Rev 618, 629 (1959); Comment, 48 Ia L Rev 213 (1962); Notes and Comments, The "Public Purpose" of Municipal Financing for Industrial Development, 70 Yale L J 789 (1961).

In the 19th Century, to induce railroads and sometimes canal companies to build to or through them, many municipal corporations gave them tax money, credit or other valuable advantages. Economic disaster frequently followed when the railroad failed in its obligations. The obligations of the municipalities were general in character, and the general taxpayers were required to pay for the defaults. Restrictive provisions such as §§ 7 and 9, Art. XI of the Oregon Constitution were enacted to protect the public credit against such raids. They were placed in constitutions

[9] An article in 48 Iowa L Rev 213 (1962) sounds a warning that this method of financing private industrial plants may be ultimately destructive to private industry itself, as well as dangerous to the credit of the municipalities involved. It quotes an article in April 28, 1962, Business Week as critical of the practice, and as stating that "some financial spokesmen feel that increases in the number and size of bond issues may cause Congress to repeal the current tax exemption for income from municipal bonds." Supra at 218.

in order that pressures of the moment could not overwhelm legislatures, municipal governing boards and councils, and even local elections. Where restrictive provisions were not placed in constitutions, similar restrictions were enforced by the courts through the device of restricting use of public money or credit to public purposes. Notes, 59 Colum L Rev and 66 Harv L Rev, supra.

Financing of industry or proprietary functions of local government by restricted revenue bonds at that time was an unused and virtually unknown device. See Foley, *Revenue Financing of Public Enterprise,* 35 Mich L Rev 1 (1935) ; *The Public Use of Private Capital: A Discussion of Problems Related to Municipal Bond Financing,* 35 Va L Rev 285, 289 (1949) ; Note, 59 Colum L Rev 618, supra. The appendices of the Foley article show that revenue bond authority for public enterprises, except for very isolated instances, began to show up in the late 1920's and became common in the 1930's. They authorized revenue or special fund financing of projects such as housing authorities, educational institution dormitories, municipally-owned public utilities, toll bridges, public market buildings, etc. These presented no problem as to "public purpose," and were held not to violate the constitutional prohibition. *Morris v. City of Salem et al,* 179 Or 666, 671, 174 P2d 192 (1946) ; *Johnson v. School Dist. No. 1,* 128 Or 9, 270 P 764, 273 P 386 (1928).

It was probably inevitable, the way having been shown to revenue financing that kept inviolate the general taxation, that there would be an attempt to enlarge the concept of "public purpose" to include within this method financing of industries in order to induce them into the area. Heavy federal income taxes, coupled with the exemption already noted for the in-

come from municipal securities, supplied a substantial incentive for industry to try to finance by this method. State after state has authorized one or more classes of its municipalities to offer this financing method to private industries until now it appears that it is accepted as valid in at least 22 states.

Constitutional provisions like those of §§ 7 and 9, Art. XI, supra, have been construed, with few exceptions, as no obstacle. *Newberry v. City of Andalusia et al,* 257 Ala 49, 57 So2d 629 (1952); *DeArmond v. Alaska State Development Corporation,* 376 P2d 717, 721 (Alaska 1962); *Roan v. Connecticut Industrial Building Commission,* 150 Conn 333, 189 A2d 399, 404 (1963); *Green v. City of Mt. Pleasant,* 256 Iowa 1184, 131 NW2d 5 (1964); *Faulconer v. City of Danville,* 313 Ky 468, 232 SW2d 80 (1950); *Hebert v. Police Jury of West Baton Rouge Parish,* 200 So2d 877 (La 1967); *City of Gaylord v. Beckett,* 378 Mich 273, 144 NW2d 460 (1966); *Village of Deming v. Hosdreg Company,* 62 NM 18, 303 P2d 920 (1956); *Holly v. City of Elizabethton,* 193 Tenn 46, 241 SW2d 1001 (1951); *Industrial Development Authority v. Suthers,* 208 Va 51, 155 SE2d 326 (1967). Many more cases could be cited which hold to the same effect.

A few state supreme courts have ruled that such constitutional provisions do prevent this financing. *State v. Clay County Development Authority,* 140 So2d 576 (Fla 1962); *Village of Moyie Springs, Idaho v. Aurora Mfg. Co.,* 82 Ida 337, 353 P2d 767 (1960); *State ex rel Beck v. City of York,* 164 Neb 223, 82 NW2d 269 (1957).

There is a question whether Florida is firmly in this minority group. See *State v. City of Tallahassee,* 142 Fla 476, 195 So 402 (1940), and dissenting opinions in *State v. Clay County,* supra.

In 1957, the Nebraska Supreme Court firmly ruled the constitutional prohibition did prohibit. (*Beck, supra.*) But in 1960, the Nebraska Constitution was changed by popular vote, so that Nebraska has, by this different method, joined the majority. *State ex rel Meyer v. County of Lancaster,* 173 Neb 195, 113 NW2d 63 (1962). Idaho may be alone in unequivocally holding that the constitutional prohibition prohibits this method of financing.

As noted, supra, the revenue bond method of financing could not have been in the ken of the constitution writers in 1859. The only conclusion that can be drawn from history is that they were looking for a way, as they wrote §§ 7 and 9, Art. XI, to prevent exposing the sources of public revenue to potential hazard. This prohibition should be construed in the light of this intention.

The proposal of Northwest Aluminum states:

"The ordinance pursuant to which the bonds are to be issued will expressly provide, as required by ORS 777.560, that the 'bonds shall not in any manner or to any extent be a general obligation of the port issuing the bonds, nor a charge upon the tax revenue of such port, nor a charge upon any revenues or property of such port not specifically pledged thereto'. The ordinance will also provide that the bonds are to be paid solely from the rentals and other moneys derived from the lease of the project by the Port of Astoria to Northwest Aluminum. The lease will be what is commonly known as 'net-net' lease with Northwest Aluminum paying all expenses, including maintenance, taxes, and insurance. The annual rental will be sufficient to pay the interest on and amortize the bonds over a 25-year period, provide necessary reserves, and pay all expenses of the trustee, the paying agent and of the Port of Astoria in connection with the lease of the project and the bonds.

"The obligation of Northwest Aluminum to pay rentals will be unconditional until the bonds are paid in full or adequate provision has been made for such payment. This obligation will become binding on the lessee on the effective date stated in the lease and will continue unconditionally in force and effect notwithstanding that the project is never completed, is totally destroyed, or never produces alumina or aluminum.

"The lease will also contain the usual and customary option in leases made in connection with similar financings whereby Northwest Aluminum may purchase the project at the end of the lease term and after the bonds are fully paid, upon paying $50,000 to the Port.

"In addition, the ordinance and bonds shall contain the covenants and provisions required by Chapter 777 ORS, including but not limited to the following:

"(1) the denomination of the bonds;

"(2) the type, coupon or registered, or both;

"(3) the date of issue and respective maturity dates;

"(4) the respective interest rates;

"(5) redemption provisions;

"(6) provisions as to registration; and

"(7) provisions for the establishment of a special fund into which rental and other payments will be made by Northwest Aluminum and from which the moneys to pay the principal of and interest on the bonds will be drawn.

"The ordinance will also provide that condemnation awards, insurance proceeds, and similar calamity revenues will be used to either rebuild the project or retire the bonds. The lease will require Northwest to keep the project in good operating condition and to make necessary repairs, renewals and replacements. Northwest will be required to keep the project continuously insured against such

risks as are customarily insured against by businesses of like size and type, including insurance against loss by fire and other perils, and liability for damage to person or property occurring on or in any way related to the project."

There seems no way, under this proposal, if the applicable ordinance and the revenue bonds quote each of these restrictions, as this court holds they must in order not to run counter to § 9, Art. XI, by which the taxpayers or other property of the Port may be held generally accountable in taxes or otherwise in the event of default.

Appellant contends that if default occurs, even with the assurances given, there may be a way to get at the general taxpayer, and he cites *Public Market Co. v. Portland,* 171 Or 522, 130 P2d 624, 138 P2d 916 (1943). To this could be added *Morris v. City of Sheridan,* 86 Or 224, 167 P 593 (1917). These cases held that where a project was to be financed from a special fund, if the city, through its officers, acted negligently in protecting the fund for the special creditor, or the city breached its contract to the creditor's loss, the creditor could recover against the city generally. This danger is covered in the law review articles cited supra. For example, from 70 Yale L J at 793:

"* * * [T]here are numerous ways in which a municipality may become directly liable to the revenue bond holders. If the municipality were grossly negligent in the issuance of the bonds, because it was clearly impossible for the project to succeed, the municipality might be held in breach of an implied covenant of good faith. Misrepresentation, implied covenant or warranty, and breach of trust are additional theories through which the general taxing power of the municipality might be reached."

■ These, and any other such possibilities that might be found, we deem to be foreclosed in the event of default of these bonds by reason of the language quoted above from Northwest Aluminum's proposal dated August 31, 1967, all of which must be quoted in the authorizing ordinance and upon the face of the bonds. Prospective bond purchasers will be thus placed on notice that their payment recourse in any eventuality is to the financed facilities and their income, and Northwest Aluminum Company. If these requirements were not made, we could not hold, as we do, that there is no violation in this proposal of §§ 7 and 9, Art. XI of the Oregon Constitution.

We are not of the opinion that the 1917 amendment to § 9 should in any way alter the construction we above placed upon the whole section. It provided for the giving of *public money,* not the aid of revenue bond financing, for a specific limited purpose. Revenue bond financing appears no more to have been in mind in 1917 than it was in 1859 when the principal section was drafted.

Appellant argues that the purpose of the proposal is not public, as previously noted. In one sense, the argument may not be to a true issue, for this proposal, as seen, has no possibility of involving an expenditure of public funds. The constitutional prohibition, as herein construed, is to a giving of a public thing of value or a lending of credit in aid of a private corporation—a credit that has the possibility of general tax liability. However, it appears proper to consider whether a public purpose is served, because under this plan, no matter how it is construed, both the Legislature and the Port are aiding Northwest Aluminum in order to induce it to locate in Astoria. In earlier discussion it was noted that there are two general

objections that can be raised against the validity of the plan. First is that it violates constitutional provisions; second is that it does not serve a public purpose. The latter rests upon the same fundamental reasoning that prompted the adoption of the constitutional prohibition. It is a part of the common law of the state and must be considered, as well as the language of the constitution.

Much has been written in the cases and law reviews already cited about public purpose. The cases generally hold that if there is a substantial public benefit, the plan is not defeated if a private purpose also is served. "The grounds for deciding such cases * * * are seldom articulated clearly. * * * [T]he relevant inquiry would seem to be whether the proposed project will augment the community's total value position." 70 Yale L J, supra at 791 and 796.

"The only valid criterion would seem to be whether the expenditures are sufficiently beneficial to the community as a whole to justify governmental involvement; but such a judgment is more appropriate for legislative than judicial action. The judiciary should invalidate expenditures only where reasonable men could not differ as to their lack of social utility." Note, 66 Harv L Rev 898 at 903 (1953).

■ Looked at in the light of these sensible tests, rather than some of the obscure tests found in the cases, we find there is a public purpose served by the implementation of the proposal. The action of the Port is predicated upon its finding of a general benefit to the economy of the community. This is a public purpose.

We do not consider our decision in *Port of Umatilla v. Richmond et al,* 212 Or 596, 321 P2d 338 (1958),

to be inconsistent with this holding, for there the context was completely different.

We have thoroughly reviewed all the bases of challenge raised by appellant, and, in the foregoing opinion, we have thoroughly considered all that we consider substantial.

The judgment of the trial court is affirmed. Costs to neither party.