509 P.2d 705

**The INDUSTRIAL DEVELOPMENT AUTHORITY OF the COUNTY OF PINAL, Petitioner,**

v.

**The Honorable Gary K. NELSON, Attorney General for the State of Arizona, Respondent.**

No. 11059.

Supreme Court of Arizona, In Banc.

May 7, 1973.

Rehearing Denied June 5, 1973.

**370**

Rawlins, Ellis, Burrus & Kiewit by R. J. Ellis, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by Harry J. Cavanagh, Phoenix, for petitioner.

Gary K. Nelson, Atty. Gen., by Charles S. Pierson and Richard L. Sallquist, Asst. Attys. Gen., Phoenix, for respondent.

Evans, Kitchel & Jenckes, by Leslie T. Jones, Jr., Phoenix, for amicus curiae Phelps Dodge Corp.

Robertson, Molloy, Fickett & Jones, by John F. Molloy and Michael J. Meehan, Tucson, for amicus curiae Johns-Manville Products Corp.

HOLOHAN, Justice.

Petitioner, The Industrial Development Authority of the County of Pinal, is a corporation organized and existing under the provisions of A.R.S. § 9–1151 et seq. For the sake of brevity petitioner will be referred to in this opinion as IDA.

IDA brought a petition for special action in this Court against the Attorney General, seeking an order from this Court directing the Attorney General to issue an opinion that certain bond issues of IDA are in conformity with the applicable provisions of law. We accepted jurisdiction pursuant to Article VI, Section 5, of the Arizona Constitution, 1 A.R.S.

The relevant facts are that in August 1972 the Board of Directors of IDA autho-

rized, pursuant to Title 9, Chapter 11, Arizona Revised Statutes, the issuance of certain revenue bonds for a project known as the "Magma Copper Company Project." Two separate bond issues were authorized. One issue was for 30 million dollars with the proceeds to be loaned to the Magma Copper Company for the purchase and installation of air pollution control facilities in its smelter at San Manuel, Arizona. Repayment of the bonds would come from the proceeds of the repayment of the interest and loan by the company to IDA. The second issue for 5 million dollars was for the acquisition by IDA of real property and construction on it of air pollution control facilities and machinery. The real property and improvements were to be subject to a mortgage as security for the bond holders. The real property and improvements were to be leased to the Magma Copper Company whose rental payments on the lease would be used by IDA to repay the bonds. Pinal County and its taxpayers would have no obligation or liability for the repayment of any of the bonds in either issue.

Prior to issuing the bonds IDA, pursuant to A.R.S. § 9–1171, subsec. F, notified the Attorney General of Arizona, respondent, of its intent to issue the bonds.

The Attorney General advised IDA by letter that he had reviewed the documents submitted in support of the proposals to issue bonds, and that:

> "I would have been able to issue an opinion that the issuance of the bonds by the Authority pursuant to the Revolving Credit and Term Loan Agreement is in conformity with the Act were it not for the matters or questions listed below, . . . ."

The "questions listed below" was a series of questions concerning either the constitutionality or the validity of the statute under which IDA was acting. Despite the letter of the Attorney General, in October 1972 IDA caused the Loan Agreement bonds to be issued and advised the Attorney General of its action. On October 10,

1972, the Attorney General advised IDA that the bond issue was void.

The Attorney General contends that the legislation under which IDA seeks to act is unconstitutional in that it is in violation of at least three sections of the Arizona Constitution, namely, Section 7, Article IX; Section 13, Part 2, Article IV; and Section 7, Article XIII. The Attorney General further questions whether a project under the act may be financed for a company already doing business in Arizona, whether air pollution control facilities are a project within the definitions set forth in A.R.S. § 9–1151, and finally whether a corporation organized under the provisions of A.R.S. § 9–1151 et seq. can validly undertake financing of pollution control facilities as provided in A.R.S. § 9–1221 et seq.

Whenever the constitutionality of a legislative enactment is assailed, the party questioning the validity of the statute must overcome the presumption in favor of the constitutionality of legislative enactments. State v. Krug, 96 Ariz. 225, 393 P.2d 916 (1964). The Court will uphold the legislation if there is any legal basis for its validity. Hernandez v. Frohmiller, 68 Ariz. 242, 204 P.2d 854 (1949).

This Court is not concerned with the wisdom, necessity, propriety or expediency of the legislation in question. These latter elements are matters exclusively within the province of the legislature.

In March 1968 the legislature added Arizona to the list of some 42 other states authorizing some form of governmental financing to encourage local industrial development. The act, Chapter 11, Title 9, Arizona Revised Statutes, § 9–1151 et seq., authorized corporations to be formed in cities and counties, subject to the approval of the governing body of the city or county, for the purpose of issuing bonds to finance acquisition of land and equipment for lease to others. The rental payments would be used to pay the principal and interest of the bonds. A corporation organized under the act would be styled an "industrial de-

velopment authority," but the bonds, debts, obligations, and agreements of such corporations would not be the responsibility, obligation, or liability of a city or county.

The act was amended in April 1972 to provide that corporations organized under the act would be political subdivisions of the state. A.R.S. § 9–1152. The amendment also provided that the corporations were authorized to finance acquisition and construction of pollution control facilities.

Additionally, the legislature enacted Chapter 12, Title 9, Arizona Revised Statutes (§ 9–1221 et seq.) authorizing the formation of corporations to finance the acquisition and construction of pollution control facilities under terms and conditions substantially the same as were provided for corporations under the 1968 act.

The purpose of the 1972 act was to " . . . finance the acquisition and installation of, or the construction and leasing of, properties, machinery and equipment intended to prevent or limit air, water and other forms of pollution for the purpose of protecting the health and welfare of the citizens of this state and to facilitate compliance with existing or future air, water and other quality standards designed to improve the environment, . . . . "

Pursuant to A.R.S. § 9–1230, subsec. B, corporations organized pursuant to A.R.S. § 9–1151 et seq. were authorized to act with the same powers as corporations created by the 1972 act.

The Attorney General questions the constitutionality of the statutes involved, on three separate bases. First, the Attorney General contends that the statutes are in violation of Article IX, Section 7:

> "Neither the State, nor any county, city, town, municipality, or other subdivision of the State shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation, or become a subscriber to, or a shareholder in, any company or corporation, or become a joint owner with any person, company, or corporation, except as to such ownerships as may accrue to the State by operation or provision of law."

Constitutional provisions similar to the above are found in many of the constitutions of the states. These provisions were designed to prevent the economic losses of the 19th century suffered by municipal corporations which gave money, credit or other valuable advantages to railroads, canal companies, etc. When the private corporations failed in their obligations, the municipalities were required to pay the obligations from public treasuries. State v. Northwestern Mutual Insurance Company, 86 Ariz. 50, 340 P.2d 200 (1959). The lessons of the 19th century resulted in restrictive constitutional provisions in the organic acts of many states, and, even without constitutional provisions, the courts of some states enforced similar restrictions by requiring that public money be used only for public purposes.

In the late 1920's a method of financing projects by government through revenue bonds gained popularity. The revenue bond became the common method of financing projects such as housing authorities, municipally-owned utilities, toll roads and bridges, public marketing buildings, college dormitories, etc. These revenue bonds were usually held not to violate the above constitutional provision because there was a public purpose involved which was financed by a special fund, and the obligation created was not a general liability of the municipality.

This Court, in Humphrey v. City of Phoenix, 55 Ariz. 374, 102 P.2d 82 (1940), upheld the constitutionality of the municipal housing act which was enacted to enable cities to take part in so-called "slum clearance" and providing low-cost housing. The statute was attacked, among other reasons, on the basis that the providing of housing for low-income persons violated Section 7, Article IX, of the Arizona Constitution. The Court stated:

> "If it be borne in mind that slum clearance projects are means adopted by soci-

ety. for self protection against crime and disease, and that money spent to prevent or eradicate these enemies is for the public good and general welfare, even though the effect is felt by a given class more than by the community at large, it will be realized the sums spent are not a gift or loan to anyone but an expenditure in the interest of the general public." 55 Ariz. at 387, 102 P.2d at 87.

Within the last two decades most of the states have authorized the use of the revenue bond device by political subdivisions to finance the attraction and development of industry within their area.

The courts of the great majority of jurisdictions who have considered the problem of whether such a method of financing is for a public purpose have concluded that it does serve a public purpose. Some 22 states have ruled that the method is constitutionally acceptable. Carruthers v. Port of Astoria, 249 Or. 329, 438 P.2d 725 (1968). A few states have held that such method of financing cannot be considered as having a public purpose. Mitchell v. North Carolina Industrial Development Financing Authority, 273 N.C. 137, 159 S.E. 2d 745 (1968).

It would serve no useful purpose to set forth a state-by-state analysis of the deci-- sions on this subject. This task has been accomplished in several well-written opinions from other jurisdictions. Carruthers v. Port of Astoria, supra; Uhls v. State, 429 P.2d 74 (Wyo.1967); Mitchell v. North Carolina Industrial Development Financing Authority, supra.

The system of financing pollution control facilities authorized by Chapter 12, Title 9, Arizona Revised Statutes, is essentially the same as that provided in many other states for industrial development. We believe that the best reasoned cases support the view taken by the great majority of jurisdictions that such method of financing does not constitute a loan or gift to private persons or corporations, but it is an expenditure in the public interest.

■ The Supreme Court of Montana in Fickes v. Missoula County, 155 Mont. 258, 470 P.2d 287 (1970), considered the issue of whether the public financing of industrial development was constitutionally permissible under their Article XIII, Section 1. Since the Arizona constitutional provision Article IX, Section 7, was taken from the Montana Constitution Article XIII, Section 1 (State v. Northwestern Mutual Ins. Co., supra), the decisions of the Montana Supreme Court interpreting that provision are persuasive.

The Montana Industrial Development Project Act which is similar to the provisions of Arizona statutes A.R.S. § 9–1151 et seq., was held to be constitutional in the Fickes case.

The project in the cited case involved the financing by a county of the acquisition and construction by a private corporation of certain facilities for the control of air and water pollution in the operation of its pulp and paper mill. Financing was to be accomplished by issuing revenue bonds. The facilities to be acquired and constructed were to be owned by the county, mortgaged to secure repayment of the bonds, and leased to the private corporation. The rental payments under the lease were to be used to repay the principal and interest due on the bonds. The county was under no obligation to pay the bonds from any source other than the rental payments. Under these facts, which are strikingly similar to those in the case at issue, the Montana Supreme Court held that the transaction was a proper exercise of the statutory authority granted the county, and that the statute under which the county acted was constitutional.

■ The Court in Fickes points out that the test to determine whether a loan or donation is prohibited by the constitution is whether the loan or donation is for a public purpose. If there is a public purpose the loan or donation is not prohibited even though some organization derives special benefit from the project. This position is in harmony with the holding of this Court

in Humphrey v. City of Phoenix, supra, and Valley National Bank v. First National Bank, 83 Ariz. 286, 320 P.2d 689 (1958).

The obvious public purpose sought to be accomplished by Chapter 12 of Title 9 is the protection of the health of the citizens of this state by preventing or limiting air, water, and other forms of pollution. This purpose is certainly as important as industrial development, and the method chosen by the legislature to accomplish the purpose is essentially the same as that approved by the vast majority of courts for funding of industrial development. We hold that the bond issues of IDA in this case do not violate the provisions of Section 7, Article IX, of the Arizona Constitution.

Next, the Attorney General urges that, to the extent Chapter 12 of Title 9 purports to grant certain powers to corporations incorporated under Chapter 11 of Title 9, the title of the act was defective as not meeting the requirements of Article IV, Part 2, Section 13, of the Arizona Constitution:

> "Every Act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in [an] Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be embraced in the title."

The constitutional provision was designed to enable the legislator upon reading the title to be advised as to what to expect in the body of the act so that he would not be surprised and enact something he did not intend. Hernandez v. Frohmiller, 68 Ariz. 242, 204 P.2d 854 (1949). It is not necessary that the title of the act be a complete index to the legislation contained within it. Taylor v. Frohmiller, 52 Ariz. 211, 79 P.2d 961 (1938). The title may be broad in its scope and this puts the legislator on notice that the proposed legislation may be equally broad in its scope. Taylor v. Frohmiller, supra.

The title of the act (Chapter 69) stated:

> "RELATING TO CITIES AND TOWNS; PROVIDING FOR THE FORMATION OF CORPORATIONS BY MUNICIPALITIES AND COUNTIES FOR THE PURPOSE OF ISSUING BONDS AND APPLYING THE PROCEEDS TO CONSTRUCT OR TO FINANCE OTHERS IN CONSTRUCTING AIR, WATER AND OTHER POLLUTION CONTROL FACILITIES, AND AMENDING TITLE 9, ARIZONA REVISED STATUTES, BY ADDING CHAPTER 12, ARTICLE 1 THROUGH 4."

The Attorney General argues that reference should have been made to Chapter 11 of Title 9. Better form would suggest this approach, but there is nothing deceptive about the title. The act deals with the formation and authority of corporations to finance pollution control facilities, and it should come as no surprise that anything germane to the subject might be found in the body of the act. The title is broad in scope, but it does not violate the constitution.

The Attorney General's final point on the constitutionality of the enactments applies to the provision of the 1972 amendment which declares industrial development corporations to be political subdivisions of the state. A.R.S. § 9–1152. The Attorney General argues that Section 7, Article XIII, provides for the only types of districts which can be political subdivisions of the state, and industrial development authority corporations are not named in the constitutional provision; therefore the legislature cannot grant political subdivision status to such corporations. We disagree.

Section 7 of Article XIII was added as an amendment to the Constitution of this State in 1940 after the decision of this Court in State v. Yuma Irrigation District, 55 Ariz. 178, 99 P.2d 704 (1940), which held that the property of irrigation districts and other types of districts was not

exempt from taxation. The object of the amendment was to grant tax exemption status to such districts.

The amendment (Section 7, Article XIII) was not intended to limit the authority of the legislature to create political subdivisions; nor did the Yuma Irrigation District decision imply any limitation on the authority of the legislature to act in this field. In Roberts v. Spray, 71 Ariz. 60, 223 P.2d 808 (1950), this Court was faced with a similar argument to that made by the Attorney General in this case. In upholding the constitutionality of the Hospital District Act of 1949, the Court disposed of the argument of whether hospital districts were districts within the provisions of Section 7, Article XIII, stating:

"This section of the constitution neither creates nor authorizes the creation of a tax-levying improvement district. The legislature needs no constitutional authority to create such a district. Its power to enact such legislation is an attribute of sovereignty which resides in the people of the state. We have been referred to no provision in the constitution and we find none which restricts the legislature in the enactment of such a law or with which it is in conflict. Therefore we hold that the legislature had plenary authority to authorize the creation of the district and to vest it with the powers therein granted." 71 Ariz. at 67, 223 P.2d at 813.

■ The legislature acted within its authority in designating corporations formed under A.R.S. § 9–1151 et seq. as political subdivisions.

■ The Attorney General calls our attention to the possibility that the mortgage permitted under the transaction in question may violate the debt limitation set by Section 8 of Article IX even though the revenue bond itself creates no such debt. He recognizes that the weight of authority is that such a mortgage does not create a debt within the meaning of Article IX, Section 8, but he points out that we have not ruled on the issue. The issue was discussed in Lerch v. Maryland Port Authority, 240 Md. 438, 214 A.2d 761 (1965), Elliott v. McNair, 250 S.C. 75, 156 S.E.2d 421 (1967), and Clarke v. South Carolina Public Service Authority, 177 S.C. 427, 181 S.E. 481 (1935), and these cases hold that a mortgage does not change the nature of the transaction. When the indebtedness is limited to the property acquired with revenue bonds, and the principal indebtedness is not considered a debt or general obligation of the political entity, the fact that the transaction includes a mortgage does not create a debt within the meaning of the constitutional provisions. We agree with this position.

■ Nor does the provision of the agreement in this case which allows the company to purchase land from IDA at its cost constitute a gift. Fickes v. Missoula County, supra; Elliott v. McNair, supra. Such provisions are a part of the consideration of the original agreement and any subsequent benefit is incidental to the total purpose, and in all instances the authority must be paid its cost.

If the enactments are constitutional, the Attorney General questions whether air pollution control facilities come within the provisions of A.R.S. § 9–1151 et seq., and whether such financing is available to a company already doing business in the state.

The Attorney General's question of the authority for IDA to act in financing air pollution control facilities comes from his inability to find air pollution control facilities as a project defined in A.R.S. § 9–1151, and he reasons that under A.R.S. § 9–1156 IDA is only granted certain enumerated powers to develop projects.

Air pollution control facilities are not a "project" under A.R.S. § 9–1151, but the authority of IDA to act in the air pollution control area is contained in A.R.S. § 9–1152:

"Any such corporation when formed shall be a political subdivision of the state and have only such governmental

powers as are set forth in this chapter, and in title 9, chapter 12."

and A.R.S. § 9–1156:

"In addition to the powers granted to such authorities by law, . . . ."

and A.R.S. § 9–1230, subsec. B:

" . . . any such corporation or authority organized under such chapter 11 shall be authorized to issue bonds hereunder for pollution control facilities and shall, in addition to the powers conferred by such chapter 11, have all powers conferred by the provisions of this chapter."

Considering the statutes as a whole it is clear that IDA has the statutory authority to finance air pollution control facilities.

The Attorney General suggests that the provisions of A.R.S. § 9–1221 et seq. are meant to apply to new business operations which would eliminate the Magma Copper Company, a concern in operation for a number of years within the county. There is nothing in the act which expresses such a limitation, so the suggestion must depend on the implications to be drawn from the act as a whole.

From a reading of the act the intent seems clearly to be that existing enterprises are eligible for financing under the Act. The purpose of the act included ". . . to facilitate compliance with existing or future air . . . quality standards. . . ." Pollution Control Facilities are defined to include " . . . machinery and equipment, whether or not now in existence or under construction. . . ." A.R.S. § 9–1221, subsec. 5. These factors strongly indicate that the legislature intended that existing companies be eligible for financing to facilitate their compliance with air quality standards. In Uhls v. State, supra, the Wyoming Supreme Court held that a statute similarly worded, but applying to industrial development, authorized acquisition of facilities already in existence.

Finally, the Attorney General argues that a Chapter 11 corporation such as IDA cannot exercise the powers of a Chapter 12 pollution control corporation because the 1972 amendment to A.R.S. § 9–1152 which grants such powers became effective one day before Chapter 12 became effective. The argument is that A.R.S. § 9–1152 could not incorporate Chapter 12 because that chapter was not in existence. The legislative history supports the chronology stated by the Attorney General. The amendment to A.R.S. § 9–1152 became effective April 24, 1972; Chapter 12 of Title 9 (A.R.S. § 9–1221 et seq.) became effective April 25, 1972.

We believe the point is academic because Chapter 12 of Title 9 accomplishes the purpose by granting Chapter 11 corporations the same powers as granted Chapter 12 corporations. A.R.S. § 9–1230, subsec. B. IDA has all the powers of a Chapter 12 corporation by virtue of the provision of that Chapter.

IDA has proceeded with the 30-million dollar bond issue without an opinion from the Attorney General; nevertheless petitioner urges that it has complied with A.R.S. § 9–1171, subsec. F which provides:

"The authority shall notify the attorney general of its intent to issue bonds. The attorney general shall within ten days of receipt of such notice issue an opinion as to whether such issue is in conformity with the provisions of this chapter."

The language of the above section differs from that found in a number of jurisdictions which provide that no bonds shall be issued without prior approval of the officer designated in the statute. See the annotation in 102 A.L.R. 90, 64 Am.Jur.2d Public Securities and Obligations § 454, and Brazos River Authority v. Carr, 405 S.W.2d 689 (Tex.1966). Without such mandatory language, the opinion of the Attorney General cannot be said to be a condition precedent to the valid issuance of bonds under the act. This does not mean that a corporation such as IDA may ignore the provisions of A.R.S. § 9–1171, subsec.

F, for the provisions of that section clearly require that the opinion of the Attorney General shall be sought, and IDA did in fact comply with the section. The Attorney General, however, failed to adhere to the requirements of the statute by giving a definite opinion whether the bond issue was or was not in conformity with the act.

The opinion of the Attorney General on the legality of bonds issued under the chapter is an important matter. This duty is imposed by law to protect the political subdivisions involved from issuing unauthorized or illegal obligations, and it gives assurances to prospective bond purchasers that the obligation is legal and enforceable.

 The relief sought in this special action is in the nature of mandamus. This remedy is available only to compel an officer to perform a duty concerning which he has no discretion, and which he has refused to perform. There is no question of discretion involved when the problem is one of applying law to established facts, and an officer who must in the first instance pass upon the question may be required to take another course after the court reaches a different conclusion upon the legal issue. Mandamus is an appropriate remedy in such instances. Board of Regents of University and State Colleges v. Frohmiller, 69 Ariz. 50, 208 P.2d 833 (1949).

 The doubtful concepts of law have been resolved in this case, and the Attorney General has agreed that the bond issues are otherwise proper. The only matter remaining undone is the issuance of the opinion required by law. The issuance of some of the bonds by IDA did not make the matter moot. The lack of an opinion by the Attorney General approving the bond issue could have an effect on the future marketability of the bonds. His opinion is both necessary and important.

The respondent Attorney General is directed to issue his opinion to petitioner IDA that the bond issues are in conformity with the provisions of Chapter 11 of Title 9, Arizona Revised Statutes.

Relief granted.

HAYS, C. J., CAMERON, V. C. J., and STRUCKMEYER, and LOCKWOOD, JJ., concur.