527 P.2d 515

**CITY OF TEMPE, a municipal corporation, Appellant,**

v.

**PILOT PROPERTIES, INC., and Baseball Facilities, Inc., Appellees.**

**CITY OF TEMPE, a municipal corporation, Appellant,**

v.

**FIRST NATIONAL BANK OF ARIZONA, a National Banking Association, Appellee.**

**BASEBALL FACILITIES, INC., an Arizona corporation, and Pilot Properties, Inc., an Arizona corporation, Appellants,**

v.

**CITY OF TEMPE, a municipal corporation, Appellee.**

Nos. 1 CA–CIV 2126, 1 CA–CIV 2478.

Court of Appeals of Arizona,
Division 1,
Department B.

Oct. 24, 1974.

Rehearing Denied Nov. 27, 1974.

Review Denied Jan. 14, 1975.

David R. Merkel, Tempe, and Snell & Wilmer by Mark Wilmer, Phoenix, for City of Tempe.

Streich, Lang, Weeks, Cardon & French by Dan M. Durrant, and Jennings, Strouss & Salmon by Thomas J. Trimble, Phoenix, for First National Bank.

Leven B. Ferrin, Donald W. Harris, and Hughes & Hughes, P. C. by John C. Hughes, Phoenix, for Baseball Facilities, Inc. and Pilot Properties, Inc.

JACOBSON, Chief Judge, Division 1.

The main issue on this appeal is whether a lease of certain real property belonging to the City of Tempe upon which a major league baseball spring training facility was constructed violates Article 9, § 7 of the Arizona Constitution, A.R.S., prohibiting a city from "subsidizing" a private corporation.

This action was originated by the Milwaukee Brewers' Baseball Club (Milwaukee Brewers) for declaratory and injunctive relief against appellant City of Tempe; Pacific Northwest Sports, Inc.; and appellees Pilot Properties, Inc. (Pilot); Baseball Facilities, Inc. (BFI); and First National Bank (Bank). Count II of the Milwaukee Brewers complaint sought to have declared invalid a lease agreement entered into between the City of Tempe and BFI on the grounds it contravened the provisions of Article 9, § 7 of the Arizona Constitution. Tempe answered this suit and filed a crossclaim against all other defendants, seeking to quiet title to the leased premises. The Bank, Pilot and BFI all filed answers and motions for summary judgment as to Tempe's crossclaim and Count II of the Milwaukee Brewers' complaint.

Tempe responded to these motions and filed a motion for summary judgment on its own behalf and against BFI and Pilot on their crossclaim, which alleged malicious slander by Tempe of BFI and Pilot's leasehold interests. The main issue joined in the motions for summary judgment was whether Article 9, § 7, Arizona Constitution, invalidated the lease agreement between Tempe and BFI.

The trial court resolved this issue against Tempe and in favor of the Bank, BFI, and Pilot, upholding the validity of the lease, but also granted judgment in Tempe's favor as to the malicious slander

allegation. The Bank obtained a written judgment containing the express determination required by Rule 54(b), Rules of Civil Procedure, thus making that judgment final and appealable. Tempe timely perfected an appeal of that judgment, becoming cause No. 1 CA–CIV 2126 in this court. Sometime later, the summary judgment granted BFI and Pilot was entered containing Rule 54(b) language from which Tempe likewise appealed and which bears cause No. 1 CA–CIV 2478. The two appeals were consolidated.

It appears that sometime during the early 1950's the city council of Tempe became interested in attracting a major league baseball team to conduct its spring camp session in the City of Tempe. It is undisputed that the city council was motivated in this desire by an opinion that a major league baseball club training in Tempe would be beneficial to the city from an economic, recreation and prestige standpoint.

The city originally owned approximately 14 acres in the Twin Butte area of Tempe adjacent to Broadway Avenue and the Maricopa Freeway. As interest in this project developed, Tempe was successful in obtaining 44.46 acres in the immediate area from Maricopa County for the sum of $36.00, the deed containing restrictions that the "real property shall be operated and maintained solely for park, recreation, and public accommodations and convenience purposes." An additional eleven acres were purchased by the city for $54,000.00. The deed to this acreage gives to the grantors the right to repurchase, at the original purchase price, in the event a major league baseball park was not constructed thereon within a certain time limit, "or if after completion of construction the property is not used primarily and actively for the purpose of a major league baseball park." Forty additional acres were acquired by Tempe by trading 18 acres of cemetery land owned by Tempe, having a value of $36,000.00. This approximately 110-acre package formed the basis of the leasehold under attack here.

On April 3, 1966, Tempe entered into a lease of this property with BFI. The term of the lease was for 99 years at an annual rental of $1.00 per year payable in advance. This original lease was modified by five amendments, which when considered with the original lease as to terms and rental, basically provides as follows:

(1) BFI must use some part of the leased premises to develop a major league spring training complex and BFI is authorized to use any other portion of the leased premises for "such other facilities and enterprises deemed necessary by lessee to cause the construction and operation to be financially feasible to lessee." No right of approval of construction was retained by the city.

(2) Tempe was required to subordinate its interest in the land to any mortgages obtained "to place capital improvements on the premises."

(3) At the expiration of thirty years of use by any major league team or upon the payment of the prime construction mortgages, the baseball field, stadium, dressing rooms and other baseball facilities (but not other capital improvements) would become the property of Tempe, free and clear of encumbrances, subject to the obligation of Tempe to maintain the baseball facilities. The ground underlying these limited improvements would be leased back to Tempe, again, subject to Tempe's obligation of maintenance. Under the revision clause, if Tempe did not continue to use these facilities for organized municipal baseball, the improvements would again revert back to BFI.

(4) BFI agreed to pay all taxes and provide adequate insurance.

(5) BFI had the right to assign the lease without prior approval of Tempe.

(6) Tempe agreed to grant any zoning requested by BFI and agreed at its own expense to bring sewer and water utilities to the property line.

(7) The lease could be revoked by Tempe if BFI "is unable to secure a contract from a major league baseball team" and did not start construction of the baseball complex within eighteen months after completion of the freeway and did not substantially complete construction within two years after starting.

After obtaining the lease, BFI entered into an agreement with Pacific Northwest Sports, Inc. (Pacific) which was the holder of a major league franchise (the Seattle Pilots) to form Pilot Properties, Inc., for the purpose of constructing the baseball spring training complex. Pacific agreed to use this complex for a period of 20 years for its major and minor league spring training camps at a rental of $5,000.00 per year plus $4,028.00 per month. BFI then assigned all of its interest in the lease to Pilot. The stadium and spring training complex were then constructed at an approximate cost of $835,000.00, in part financed by a loan of $500,000.00 from the Bank which obtained a mortgage on the leasehold interest of Pilot and BFI. In 1969, the Seattle Pilots after training at the completed facility for some time, encountered financial difficulties and filed a Chapter XI bankruptcy proceeding. As part of this proceeding and the sale of the Seattle Pilot franchise to the Milwaukee Brewers, the Brewers entered into a sublease agreement of the Tempe facility at an annual rental of $50,000.00. The parties were in this posture when the Brewers brought this action to declare the lease void.

Following the judgment of the trial court in favor of the Bank and the appeal by Tempe in cause No. 1 CA–CIV 2126, but prior to the appeal in cause No. 1 CA–CIV 2478, the Milwaukee Brewers, the Bank, BFI and Pilot, but not Tempe, entered into a settlement agreement whereby Milwaukee paid to the Bank $400,000.00 in consideration of Pilot releasing it from its sublease agreement to conduct spring training at the Tempe facility. Because of this development, Tempe contended in the trial

court that a fact issue was raised as to the failure of consideration for the original lease with BFI which would preclude the trial court from entering a Rule 54(b), Rules of Civil Procedure, judgment in favor of BFI and Pilot on their prior motions for summary judgment. This forms the basis for Tempe's appeal in cause No. 1 CA–CIV 2478.

In summary then, the only parties and issues before this court in this consolidated appeal are the City of Tempe, which is contending that the lease wth BFI is unconstitutional and that the trial court abused its discretion in entering a 54(b) judgment in favor of BFI and Pilot; the Bank, which seeks to uphold the validity of the lease; and BFI and Pilot which contend that the trial court did not abuse its discretion in entering judgment in their favor and by way of a cross-appeal contend the trial court improperly granted summary judgment to the City of Tempe on their claim of malicious slander of their leasehold interest.

## CONSTITUTIONALITY OF THE TEMPE–BFI LEASE

Article 9, § 7, of the Arizona Constitution, provides:

"Neither the State, nor any county, city, town, municipality, nor any other subdivision of the State, shall ever give or loan its credit in the aid of, or *make any donation or grant, by subsidy or otherwise,* to any individual, association, or corporation, or become a subscriber to, or a shareholder in, any company or corporation, or become a *joint owner with* any person, company, or corporation, except as to such ownerships as may accrue to the State by operation or provision of law." (Emphasis added.)

The purpose of this constitutional provision, which appears in some form in most states, was set forth in State v. Northwestern Mutual Insurance Co., 86 Ariz. 50, 340 P.2d 200 (1959), quoting from Thaanum v. Bynum Irr. Dist., 72 Mont. 221, 232 P. 528 (1925):

"It represents the reaction of public opinion to the orgies of extravagant dissipation of public funds by counties, townships, cities and towns in aid of the construction of railways, canals, and other like undertakings during the half century preceding 1880, and it was designed primarily to prevent the use of public funds raised by general taxation in aid of enterprises apparently devoted to *quasi* public purposes, but actually engaged in private business." 86 Ariz. at 53, 340 P.2d at 201. (Emphasis in original.)

While the purpose of the constitutional provision may be of more historical interest than legal in this case, it does serve to focus attention on the evil sought to be avoided, even though the private business receiving the largess is dressed in the guise of an "enterprise apparently devoted to *quasi* public purposes."

Based upon the language of the constitutional provision, Tempe argues that the leasing of 110 acres of city property to BFI for a rental of only $1.00 per year results in a "subsidy" which is prohibited. The Bank, on the other hand, argues two theories to uphold the lease: (1) that a substantial consideration was received by the City of Tempe under the lease which is not subject to judicial review and (2) the lease was executed for a "public purpose" which removes it from the constitutional prohibition.

We turn first to the Bank's argument that because of the "public purpose" in bringing major league baseball to Tempe with its attendant economic and recreational benefits, the constitutional provision is not violated. In reviewing the Arizona case law on this subject, it is important to distinguish the term "public purpose" when used in characterizing the expenditure of public funds for a specific purpose and utilization of that term to justify an exception to the constitutional provision prohibiting a subsidy.

Thus, in the Town of Gila Bend v. Walled Lake Door Co., 107 Ariz. 545, 490 P.2d 551 (1971), the city contended that

the building of a waterline to provide fire protection primarily to a private business was in violation of the constitutional provision under discussion here. The court, in disposing of this contention noted that the ownership and control over the waterline was to remain in the city and stated that:

".  .  .  Merely because an individual may indirectly benefit from a public expenditure does not create an illegal expenditure." 107 Ariz. at 550, 490 P.2d at 556.

The court went on to hold the expenditure of public funds for a waterline is ".  .  . for purposes of preserving and protecting lives and property [and] is a 'public purpose' and one which will provide a direct benefit to the public at large." What *Walled Door* decided was not that a "public purpose" would remove an expenditure of public funds from the constitutional prohibition against subsidizing private industry, but that where the ownership of the subject matter of the expenditure remains in the city and the subject matter constitutes a "public purpose," the expenditure is constitutionally permissible.

Likewise, in Industrial Develop. Auth. of Cty. of Pinal v. Nelson, 109 Ariz. 368, 509 P.2d 705 (1973), the court discusses the "public purpose" involved in allowing a political subdivision to issue revenue bonds for the financing and construction of pollution control facilities for private industry, the repayment of which would not be a charge against the public treasury. *Industrial Development* does contain language, which taken out of context, appears to support the Bank's position. For example:

"The Court in *Fickes* [Fickes v. Missoula County, 155 Mont. 258, 470 P.2d 287 (1970)] points out that the test to determine whether a loan or donation is prohibited by the constitution is whether the loan or donation is for a public purpose. If there is a public purpose the loan or donation is not prohibited even though some organization derives special benefit from the project." 109 Ariz. at 373, 509 P.2d at 711.

Upon analysis, however, in both the *Industrial Development* case and the Montana *Fickes* case, what the courts determined was that since public monies would never be expended to repay the revenue bonds involved, no debt or liability on behalf of the political subdivision was created so as to bring into play the constitutional prohibition. As stated in *Industrial Development*:

".  .  . These revenue bonds were usually held not to violate the above constitutional provision [Article 9, § 7] because there was a public purpose involved which was financed by a special fund, and the obligation created was not a general liability of the municipality." 109 Ariz. at 372, 509 P.2d at 709.

In our opinion, the "public purpose" rationale only becomes material in determining whether a certain *expenditure* of funds is proper. *See*, Humphrey v. City of Phoenix, 55 Ariz. 374, 102 P.2d 82 (1940). If such a public purpose is found, for example, in making the atmosphere the general public breathes cleaner, then there is a proper expenditure of such funds, even though a private industry may receive an incidental benefit from such an expenditure—as in *Industrial Development* by allowing Magma Copper to comply with clean air standards.

This then brings us to Heiner v. City of Mesa, 21 Ariz.App. 58, 515 P.2d 355 (1974). *Heiner* involved a gift by the City of Mesa of approximately ten acres of land to Good Samaritan Hospital, a private corporation, for the purpose of building a much-needed new hospital to serve the Mesa area. Department A of this court, after discussing the history of this property and its use as a hospital facility, concluded that the public good and general welfare would be served by this hospital. The court then held:

"The public benefit removes the contemplated deed from the restrictions of § 7 of Article 9 of the Constitution and

constitutes a valid and valuable consideration under the circumstances presented to us in this case."

■ As a proposition of law, we must respectfully disagree with this statement. A donation of public property to a private corporation for a purpose that is deemed by the city fathers to be for the public good, in our opinion falls squarely within the prohibition of our constitution and the purpose of such a provision as determined by our Supreme Court. As was stated in State v. Trujillo, 46 N.M. 361, 369, 129 P. 2d 329, 333 (1942), passing on New Mexico's anti-donation constitutional provision:

". . . the constitution makes no distinction as between 'donations,' whether they be for a good cause or a questionable one. It prohibits them all."

■ We therefore hold that merely because a private individual or a corporation uses public funds or property for a "public purpose" is not sufficient, in and of itself, to remove that use from the provisions of Article 9, § 7 of the Arizona Constitution prohibiting a "donation or grant, by subsidy or otherwise." Were we to hold otherwise and say that a "public purpose" was the only "criterion by which the validity of an appropriation of public funds is to be measured, there would be hardly any limit upon the right of the state, county, city, or school districts to appropriate monies to a private corporation." Harrington v. Atteberry, 21 N.M. 50, 54, 153 P. 1041, 1042 (1916).

The Bank next contends that whether the lease between the City and BFI is a "subsidy" must be measured not by the amount of the rental alone, but by all the terms of the lease, and when so measured, the city has received a substantial consideration for use of its property which removes it from the terms of the constitutional provision. A corollary to this argument is that what constitutes a "substantial consideration" is within the discretionary powers of the city council to determine and may not be second-guessed by the courts.

While the Bank argues that the word subsidy as used in the constitutional provision—"make any donation or grant, by subsidy or otherwise"—is an example or illustration of what is included in the word "grant" and "donation", it is clear that the drafters of this provision intended that government property or funds were not to be given to private industry and whether we characterize a subsidy as being merely more illustrative or as an absolute prohibition along with "grants", or "donations", this intent must be given effect.

Clearly, under A.R.S. § 9–241 (1956), the City of Tempe has authority to lease its property. Moreover, it is not seriously argued that Tempe could not lease its property to a private corporation for carrying on major league spring training, a "public purpose." What is argued is that the City of Tempe cannot lease its property to a private corporation for carrying on major league spring training where the terms and conditions of the lease result in grant or donation in the form of subsidy being bestowed upon a private corporation.

The question thus posed is "Do the terms and conditions of the BFI lease bestow a grant or donation in the form of a subsidy?"

"Subsidy" has been defined as:

". . . a grant of funds or property from a government, to a private person or company to assist in the establishment or support of an enterprise deemed advantageous to the public." State Tax Commission v. Miami Copper Co., 74 Ariz. 234, 241, 246 P.2d 871, 876 (1952).

In our opinion, the operative word of this definition is the word "assist". "Assist" means "to give support or aid to, especially in some undertaking or effort," Webster's 3rd New International Dictionary (1969). When used in the frame of reference under discussion, it has connotations of the city receiving less than the fair market value for its property, thus resulting in aid or support of BFI. Stated conversely, obviously, if BFI was paying the fair market rental for the property involved, it could

not be the recipient of a gift or donation in the form of a subsidy for it would be receiving no aid or support from the city.

In our opinion, the rule governing a determination of whether a gift or donation has been granted by a municipality to a private corporation is the same as the rule determining the validity of municipal contracts generally. As stated in City of Phoenix v. Landrum & Mills Realty Co., 71 Ariz. 382, 227 P.2d 1011 (1951):

> ". . . [I]t must be kept in mind that one attacking the validity of a contract made by a municipality has the burden of showing that such a contract was so improvident that it amounts to a palpable abuse of discretion. It is not enough to show that the contract was disadvantageous to the city or that it might possibly prove to be such. We hold that the showing must be that the contract was either tainted with fraud or so inequitable and unreasonable that it amounts to an abuse of discretion." 71 Ariz. at 388, 227 P.2d at 1014.

We, therefore, hold that if the consideration received by the city for the BFI lease is "so inequitable and unreasonable that it amounts to an abuse of discretion," a gift or donation by way of a subsidy has been bestowed on BFI which is prohibited by the Arizona Constitution. In making such a determination, the fair market rental value of the property, the benefits bestowed on the city by obtaining title to a stadium, and other factors dealing with consideration received would be material. Since there are material issues of fact to be resolved in the question of whether a subsidy has been bestowed, the matter must be reversed and remanded to the trial court for a resolution of these issues, the matter having come to this court by way of summary judgment.

### THE CROSS–APPEAL

BFI and Pilot have cross-appealed, contending that the trial court improperly granted summary judgment on their cross-claim alleging the city slandered its leasehold interest. The basis of this allegation involves statements attributed to the city attorney stating to the public press that serious legal questions existed concerning the validity of the lease in question. These statements were followed by the action by the Milwaukee Brewers in which Tempe joined seeking to declare the lease invalid.

The elements of slander of title, in this case slander of the leasehold interest, are the uttering and publication of the slanderous words by the defendant, the falsity of the words, malice and special damages. 50 Am.Jur.2d, Libel and Slander § 541, p. 1060 (1970). Of these elements, malice has been said to be the gist of the action. Glieberman v. Fine, 248 Mich. 8, 226 N.W. 669 (1929). Thus a bona fide claim of title or comments on matters of public interest are generally held to be qualifiedly privileged and will defeat the action unless actual or express malice is shown. *See,* Kemart Corp. v. Printing Arts Research Lab, Inc., 269 F.2d 375 (9th Cir., 1959), and Sinclair Refining Co. v. Jones Super Service Station, 188 Ark. 1075, 70 S.W.2d 562 (1934).

In this case, the alleged slanderous statements were made by the city attorney of Tempe, dealing with a subject of public interest (a stadium built on city property), preparatory to the filing of lawsuits contesting the validity of the lease involved. In such a case, it is our opinion that it was incumbent upon BFI to come forward with evidence showing the actual malice (as compared to implied malice) of the city attorney to avoid the granting of summary judgment. This BFI failed to do. Under the circumstances here, we hold the trial court properly granted judgment in favor of Tempe.

### APPEAL IN CAUSE NO. 2478

As previously stated, the only substantive issue raised by Tempe in its appeal from the granting of summary judgment in fa-

vor of BFI and Pilot is the propriety of the court directing entry of final judgment in their favor after being advised of the settlement of the Milwaukee Brewers, Bank, BFI and Pilot litigation.

In view of our holding that the validity of the lease between these parties must be tried, which disposes of the central issues of this appeal, we hold that the finality of the BFI and Pilot judgment is moot and decline to pass on this subject.

For the foregoing reasons, the judgments in favor of the Bank, BFI and Pilot declaring the lease to be valid are reversed and the matter remanded for further proceedings not inconsistent with this opinion. The judgment in favor of Tempe and against BFI and Pilot and their claim of slander of title is affirmed.

HAIRE, P. J., and EUBANK, J., concur.